THE CITY OF CHICAGO

*v.*

THE ROGERS PARK WATER COMPANY.

*Opinion filed February 21, 1905.*

1. MUNICIPAL CORPORATIONS—*regulation of water rates must be reasonable.* The power of a municipal corporation, under the act of 1891, (Laws of 1891, p. 85,) to prescribe, by ordinance, maximum water rates to be charged by an individual or company supplying water to the inhabitants, carries with it the duty of ascertaining that the rates so prescribed are just and reasonable, with due regard to the property rights of the individual or company.

2. SAME—*when ordinance fixing water rates is unreasonable.* A city ordinance requiring a water company operating in annexed territory to furnish water free to private dwellings, flats and apartment buildings for sanitary fixtures, including bath-tubs, water-closets, urinals and wash-bowls, thereby depriving the company of

revenue to which it was entitled by the reasonable provisions of the ordinance under which it was organized before the territory was annexed, is unreasonable.

3. SAME—*when ordinance fixing water rates amounts to a taking of private property without compensation.* A city ordinance requiring a private water company organized and operating in annexed territory previous to annexation, to furnish free all water used in the conduct and carrying on of all charitable, religious and educational institutions is void, as a taking of private property for public and private use without compensation.

4. INJUNCTION—*when injunction need not provide for re-investigation of question.* An injunction restraining the enforcement of an ordinance fixing water rates and charges need not contain a provision reserving to the city the right to subsequently move the court to re-consider the question of the reasonableness of the rates under changed conditions, where the ordinance contains invalid provisions amounting to a taking of property without compensation, which no change of conditions could validate.

5. SAME—*when perpetual injunction becomes functus officio.* A perpetual injunction restraining the enforcement of an ordinance fixing water rates and charges will become *functus officio* when the ordinance is changed to conform to the law, at which time the question as to the reasonableness of water rates may be further investigated.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

WILLIAM D. BARGE, (EDGAR BRONSON TOLMAN, Corporation Counsel, of counsel,) for appellant.

PARTRIDGE & PARTRIDGE, (NEWTON A. PARTRIDGE, of counsel,) for appellee.

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

In 1888 the village of Rogers Park contracted with one H. E. Keeler, his successors and assigns, for the establishment of a water-works plant in that village. Appellee, a corporation organized under the laws of this State, as the assign of Keeler, built and constructed a plant and system of water-

works. At that time Rogers Park was a small village containing some two hundred or three hundred houses. The contract between Keeler and the village was in the form of an ordinance, the provisions of which were accepted, and required that the plant should have a capacity, at the outset, of 1,500,000 gallons every twenty-four hours; that mains should be laid in the street, with proper hydrants for fire protection, and that the village would pay $575 annually for each mile of main up to the first five miles and $400 annually for each additional mile, which payment by the village included all the water rentals for water rights that were accorded to it. The plan and system for the water-works were prescribed by the village, and it was required that the pumping system should be such and the works so constructed that when completed the direct pressure should be sixty pounds at the distributing mains, and should be used and maintained with sufficient force to throw water ninety feet above the level through one hundred feet of two and one-half inch hose with an inch nozzle, from six different hydrants located on different mains. The water was to be taken from Lake Michigan, was to be pure and wholesome and to be filtered, and the grantee was to make extensions of mains whenever called upon by the village to do so, in not less than 500-foot lengths. For the rental above named the village was to have all necessary water for fire purposes, for flushing sewers and gutters, for two public drinking fountains for the use of man and beast, drinking water for each public school in the village, water for the use of the fire department and of the engine house, and steam for the operation of two air compressers of not to exceed ten horse power. The ordinance provided also that the village might, at the expiration of ten years, and at the end of any five years thereafter until the expiration of the privilege, elect to buy the plant, and provision was made by which a valuation should be fixed. The ordinance also contained a schedule of rates to be paid by private consumers. Appellee constructed and established a system and plant ac-

cording to the provisions of the ordinance, and the same was put in operation in August, 1889. In 1893 the village of Rogers Park was annexed to and became a part of the city of Chicago. Up to the time that the matters arose which are involved in this suit, appellee had laid over twenty-two miles of mains in said village, and had complied with all the provisions of the ordinance relating to the construction and operation of the plant.

In 1891 an act was passed by the legislature, and approved and in force July 1, 1891, which provides: "That the corporate authorities of any city, town or village, now or hereafter incorporated under any general or special law of this State, in which any individual, company or corporation has been, or hereafter may be, authorized by such city, town or village to supply water to such city, town or village and the inhabitants thereof, be and are hereby empowered to prescribe by ordinance maximum rates and charges for the supply of water furnished by such individual, company or corporation to such city, town or village and the inhabitants thereof, such rates and charges to be just and reasonable. And in case the corporate authorities of any such city, town or village shall fix unjust and unreasonable rates and charges, the same may be reviewed and determined by the circuit court of the county in which such city, town or village may be." (Laws of 1891, p. 85.)

In 1899 the city council of Chicago voted to purchase the water-works under the provisions of the ordinance under which they were constructed, and so notified appellee, but for reasons undisclosed by the record failed to proceed or to consummate the purchase.

In 1897 the city council of Chicago passed an ordinance regulating the rates to be charged by appellee, and John B. Fergus, a private citizen of Rogers Park, refused to pay water service or rates except according to the provisions of that ordinance, and brought *mandamus* to compel appellee to accept rates according to the ordinance. In that suit the

validity of the act of the legislature conferring the power upon cities and villages to prescribe, by ordinance, the maximum rate was questioned, and it was contended by appellee that the ordinance passed by the village at the time the franchise or privilege was granted for the construction of the water-works system, in which the rates that should be charged by appellee were fixed, was a contract which should continue for the period of thirty years, and that if the act in question was valid it could have no application to appellee. That case came before this court for consideration, and the contention of appellee was denied and the act held applicable to appellee. (*Rogers Park Water Co.* v. *Fergus,* 178 Ill. 571.) From this court an appeal was prosecuted to the United States Supreme Court and the judgment of this court was affirmed. (180 U. S. 624.)

In 1902 the city council of the city of Chicago passed an ordinance which purported to be an amendment to the ordinance of 1897 but which is a complete ordinance in itself, in which it is provided "that the maxium rates and charges for the supply of water furnished by the Rogers Park Water Company to the inhabitants of that part of the city of Chicago in which said company has been or may be authorized to lay water mains and supply-pipes are hereby established and fixed so as to be uniform and equal, in every particular, with those charged by the city of Chicago for water supplied from the city water-works," and it imposed a penalty of $100 for each violation of the ordinance. Appellee then filed its bill in the circuit court of Cook county, in which it alleged that the rates fixed by the above ordinance were unjust and unreasonable rates, and asked that the city be enjoined from the enforcement of the ordinance. The bill sets out at great length all the details, including the original negotiations between Keeler and the village of Rogers Park; the provisions of the ordinance under which the system of water-works was constructed, including the rates provided by that ordinance; alleges that the plant has been constructed, extended and

maintained according to the provisions of the ordinance; that the rates to the city and the inhabitants are provided for in the original ordinance and that they are reasonable rates; alleges that the business is a hazardous one, and that plants established in so small a village as was Rogers Park at the time this plant was first installed seldom meet with success, but that that village grew very rapidly, and that the business of appellee has increased until at the time of filing the bill it had about eight hundred water customers; that it had practiced economy both in the construction of the works and in their operation, and that no dividends were paid until the year 1894, when three per cent was paid upon the actual capital stock; that no person other than the superintendent and treasurer was paid any salary, the superintendent receiving $1000 per annum and the treasurer $100, and that it is entitled to receive reasonable expenses of operation, including payment of taxes and replacement of broken and worn out machinery and repairs and to keep the original investment intact, to pay a reasonable return upon the cost of the works, and to provide a sinking fund to cover the difference between the money invested and the value of the system at the expiration of its license or franchise; that the rates prescribed by the ordinance are inadequate for the purposes named; that there is a substantial difference between the conditions under which appellee operates and conducts its plant and those relating to the city of Chicago; that the amount of water pumped by the city, daily, substantially equals that pumped by appellee in a year; that the engines of the city are larger and of much greater power; that the city pumps under low pressure while appellee is required to sustain a high pressure, and that, taking one thousand gallons of water as the unit, the city can pump and deliver at about one-third the cost that appellee can; that the population of the city is much denser than that of Rogers Park, and that the requirements as to mains and supply-pipes, in proportion to the number of water consumers, are much greater

in the territory in which appellee operates than in the city; that the city constructed its plant by taxation and without expecting any return on the capital contributed, while appellee's plant is a private enterprise constructed by individual means; that the city collects rates upon vacant premises, which appellee cannot do; that the city has a perpetual existence, while appellee's existence is limited; that the city does not filter its water and pumps at a low pressure, while appellee does filter and pumps at a high pressure; that the city is not required to rely upon the income from operation for re-building and re-placement, because it can resort to taxation, and that the quality of the water furnished by appellee is better than that furnished by the city; that under the ordinance passed by said city, appellee is required, without compensation, to supply water to the city and its inhabitants in cases where water is supplied to public property in said city, and also where bath-tubs, urinals, wash hand-basins and other fixtures, usually called sanitary fixtures, are located in private dwellings, flats or apartment buildings, and that in fixing the rates or in considering the ordinance prescribing the maximum rate for appellee no investigation was made by the city or its officers to determine a reasonable rate, but that the same was fixed arbitrarily and is unreasonable and unjust.

The city, in its answer, substantially admits all the allegations that are material in the petition, except the allegation that the rate is unreasonable and unjust, and avers that the rates would afford the company a reasonable profit on its investment. Touching the passage of the ordinance without investigation, the answer admits that to be true, but states that the city council was advised in the premises and that no investigation was necessary.

The cause was heard by the court, appellee introducing witnesses and documentary evidence but appellant offering no evidence, and a decree was entered perpetually enjoining appellant from enforcing the ordinance and finding that the

rates fixed were unreasonable and insufficient. The Appellate Court affirmed the decree, and appellant brings the cause to this court.

The allegation that the rates that were to be charged by appellee were arbitrarily fixed by the city council without any investigation on the part of the city to determine whether they were reasonable is amply sustained by the record. In fact, the question of their reasonableness was not taken into account. The ordinance was prepared by or under the direction of the mayor and by him submitted to the council with a letter or message recommending its passage, and the purpose stated is, "so that such rates should be uniform and equal, in every particular, with those charged by the city of Chicago for water supplied from the city water-works," and it is stated that the purpose of the penal clause is to compel compliance therewith. The ordinance was immediately passed, without reference to a committee or consideration of any kind.

The power conferred is, to "establish maximum rates and charges, * * * such rates and charges to be just and reasonable." As we interpret the power, it is coupled with a duty imposed on the grantee or donee of the power to ascertain what rates are, in the given case, just and reasonable, and to fix such rate as the maximum. The rates may be uniform with those charged for like service from the city and still be unreasonable. The difference in the extent of the capacity, supply and demand of the two water plants may be, and it would seem would be, quite material, as would also the difference in the duties they are required to perform. Appellee must maintain an average water pressure of sixty pounds, a fire pressure of seventy to ninety pounds and a steam pressure of forty-five to sixty pounds, while the city plant carries a low water pressure and works its engines with an average steam pressure of twenty-five to thirty pounds. These items are shown to make a material difference in the proportionate cost of fuel and operating expense. The record

shows that the city can deliver a unit of water at a general average of less than three cents, and yet, with all its advantages and enormous income, its gross receipts are only about ten per cent of the cost of the plant. The cost to appellee to deliver one thousand gallons of water has at no time during its operation been below 6.89 cents. The evidence shows that this higher cost has not been due to extravagance or bad management by appellee but is the result of natural conditions, among which are the difference in the capacity of pumps, the difference in pressure, the greater distance between appellee's consumers and the disproportion in numbers. The city has eighteen hundred and ninety miles of mains and yet has but thirty-three and one-half feet to each consumer, while the appellee has somewhat over twenty-two miles of mains and one hundred and twenty feet to each consumer, and the cost of the city plant per consumer is $113, while that of appellee is $216. With such disparity in cost of delivery it cannot, we think, be held that uniformity of rates raises the presumption of reasonableness, but that the mere statement of the facts contradicts any such contention.

The stock issued by appellee was $93,000 and was all paid in cash. The company borrowed $95,000 and issued its bonds therefor. The cost to the company of the plant was $207,722.54. Of this the stockholders paid, by stock investment and from the proceeds of the plant, $112,722, and the balance was paid from the proceeds of the bonds. The evidence shows that the property is worth $224,459, and that it began in 1889 with 68 consumers; in 1893, when taken into the city, it had 383, and in 1902 it had 998. The receipts, expenditures and gross profits are shown for five years, beginning with 1898, and are as follows:

| Year. | Receipts. | Expenditures. | Gross Profits. |
|---|---|---|---|
| 1898 | $22,067.68 | $14,156.87 | $ 7,910.81 |
| 1899 | 26,153.86 | 14,081.95 | 12,071.91 |
| 1900 | 27,241.80 | 14,683.50 | 12,558.30 |
| 1901 | 28,859.75 | 15,860.76 | 12,998.99 |
| 1902 | 30,111.89 | 17,110.16 | 13,001.73 |

The pumpage and cost per unit of one thousand gallons for the same years are as follows:

| Year. | Pumpage. | Cost per unit. |
|-------|----------|----------------|
| 1898 | 180,000,000 gallons | 7.86 cents |
| 1899 | 190,000,000 " | 7.41 " |
| 1900 | 195,000,000 " | 7.53 " |
| 1901 | 230,000,000 " | 6.89 " |
| 1902 | 232,000,000 " | 7.37 " |

Of the income for 1902, $9780.60 was paid by the city for its hydrant rentals.

By the adoption of the ordinance of 1902 the city incorporated into it the provisions of the city ordinance fixing the rates for the city water-works. The ordinance of the city provides: "In private dwellings, flats and apartment buildings no charge shall be made for so-called sanitary fixtures, including bath-tubs, water-closets, urinals and wash hand-basins." The record shows that falling within the above classes of consumption the appellee had in 1902, and received as rentals or rates under the provisions of the original ordinance, 1002 water-closets at $3 each per annum, $3006; 758 bath-tubs at $3 each per annum, $2274; 134 hand-basins at $1.50 each per annum, $201; making a total of $5481. Besides, in the city ordinance it is provided that all water must be furnished without charge that is used in the conduct and carrying on of all charitable, religious and educational institutions. The provision as to sanitary fixtures applies to private dwellings, flats and apartment buildings, and the evidence shows that these favored classes constitute most of the patrons of appellee. The rates charged by the appellee for sanitary fixtures were those prescribed by the original village ordinance. There is no evidence even tending to show that such rates were excessive, but, on the contrary, the evidence afforded by the ordinances of the city strongly supports the reasonableness of such charges, as the city itself charged for all such fixtures in all places except in dwellings, flats and apartment houses, and the scale of rates therefor found in the ordinances of the city is higher than

that fixed by the village ordinance and collected by appellee. A few illustrations will demonstrate the correctness of the above statement. By the ordinance the annual charge for a private bath-tub is three dollars; urinals in stores, banks and offices, three dollars; water-closets, per bowl, three dollars; wash-basins, three dollars. These are identical with the items from which appellee derives over $5000 of its revenue, and the water for which items, if this ordinance shall be sustained, appellee must furnish without remuneration.

The provisions of the ordinance with reference to sanitary fixtures and the water for charitable, religious and educational purposes, if enforced, can be regarded as nothing more nor less than the taking of appellee's property and appropriating the same to public and private uses. Whether such practice can be sustained as applied to the plant belonging to the city we are not called upon to determine, but that as to appellee the ordinance is void and cannot and should not be enforced we have no doubt.

Appellant seeks to justify and sustain these provisions of the ordinances upon the theory that the city may enforce the same in the exercise of the police power. In support of such contention no authority is, and we apprehend none can be, found or adduced. As applied to a business such as this, the exercise of the police power is confined to the regulation of the use of the property by the owner and to the conduct of it. The statute conferring the power to fix the rates was careful to carry with it the command that the rates should be reasonable, for the reason that neither the legislature nor the municipal authorities could take property without just compensation. There is a marked difference between the taking or appropriation of property and the regulation of its use. In the exercise of the power of eminent domain the State may take the property for the benefit of the public, but when it does so it must make just compensation for the property taken; but it has not been held nor understood to be the law that the State may, under its power of eminent domain,

take the property of the individual and appropriate or turn it over to the private use of any person or any number of persons less than the entire public.  In the exercise of the police power the State may require that the individual so manage and control his own property that the public health, public peace and public welfare may be conserved.  Usually, the police power is invoked to restrict the owner in those uses of his property which he might have as a matter of natural right, so as to conform to the welfare of established society. It is said to be founded on two maxims: First, "so use your own property as not to injure others;" and second, "the safety of the people is the supreme law." (22 Am. & Eng. Ency. of Law,—2d ed.—pp. 916-918.)  The only instance of which we are advised under which property may be taken by the public authorities from the custody and control of the individual owner without compensation is where the common weal demands its destruction, as in the case of conflagration, where a building may be destroyed to stop the advance of the fire, or where stock may be killed or property destroyed that is so infected with disease as to be a menace to the public, and other cases dependent upon like principle; and in all such cases there is, in fact, no taking by the public, but the property is destroyed upon the ground of public necessity.  It cannot for a moment be contended that there is any overweening public necessity that requires that the property of appellee shall be taken from it, or more, that it shall be required of appellee that it shall carry and deliver its property to other persons, public and private, without any compensation or remuneration therefor.  The recognition of such principle would be the destruction of private ownership of property and must not find support in the courts of justice.

We think the circuit court was entirely warranted in the conclusion reached by it that the provisions of this ordinance as to rates were unreasonable and unjust.  As this view disposes of the case, we do not deem it necessary to enter upon a field of discussion involving the method of and

the scope of the matters to be taken into account in arriving at just and reasonable rates in such cases. Because of the great diversity and marked difference in plants performing, in some degree, the same functions, each attended with its own peculiar conditions and difficulties, it may well be doubted if any general rule has been or can be formulated that will control in all such cases, but in the exercise of a power such as is conferred by the act of the legislature under which appellant claims to be acting, due regard for property rights must be observed. While the cost to the public of the service rendered by such companies, and its regulation, are matters of undoubted importance, so, too, are the rights of the owners of plants who have put into them their means and energy and devoted them to the public service. Whatever the rule may be, it must be admitted that the effort or purpose to reach uniformity must not be carried to extremes by attempting to make unlike things alike.

It is suggested by appellant that the injunction should contain a proviso reserving leave to appellant, at any time it might be so advised, to move the court for a re-investigation of the question of the reasonableness of rates, and in support of this contention *Ames* v. *Union Pacific Railway Co.* 64 Fed. Rep. 165, *Smith* v. *Ames,* 169 U. S. 466, and other cases, are cited. In all the cases relied upon the rates fixed were such that they might, under some conditions and at some future time, become reasonable, the result depending merely upon a change of business conditions. In this case no change in business conditions can give validity to the provision of the ordinance that involves the taking and appropriation of appellee's property without compensation. The only time that the question can arise authorizing a further investigation will be when the ordinance of appellant is changed to conform to the law, and when that is done the case now under consideration will have no further controlling force and the present injunction will be *functus officio*.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*