JAMES J. BYRNE, INSPECTOR OF BUILDINGS OF
BALTIMORE CITY,

*vs.*

THE MARYLAND REALTY COMPANY, A BODY
CORPORATE.

*Salus populi,—suprema lex. Police power: Limitations of—;*
*building law, question of style and taste.*

*Salus populi suprema lex.*                      p. 210

All uses of property or courses of conduct which are injurious to the health, comfort, safety or welfare of society may be prohibited under the sovereign power of the State, even though the exercise of such power may result in inconvenience or loss to individuals. In this respect individual rights must be subordinate to the higher rights of the public. The power that the State may exercise in this regard is the overruling law of necessity.                              pp. 209-210

The existence and exercise of this power are an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders all private rights the exercise of which would prove hurtful to the citizens generally.                              p. 210

While the general principle above announced is uniformly recognized, it is equally true that the owner of property has the right to make any use of it he desires that does not endanger or threaten the safety, health, comfort or general welfare of the public.                              p. 210

Under the guise of the police power, the Legislature cannot for purely æsthetic purposes, invade property rights that are guaranteed by the Constitution.                    p. 211

There is nothing inherently dangerous to the public safety or public health in properly constructed detached brick houses, and to prohibit their erection is an unwarranted extension of the use of the police power.                    p. 208

Chapter 693 of the Acts of 1912, prohibiting the building of dwelling houses within certain limits of Baltimore City therein described, unless of brick, semi-detached and at least 10 feet apart, or if of frame, 20 feet apart, is unconstitutional.    p. 214

*Decided June 23rd, 1916.*

Appeal from the Court of Common Pleas of Baltimore City. (AMBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Robert F. Leach, Jr., Assistant City Solicitor* (with whom was *S. S. Field, City Solicitor,* on the brief), for the appellant.

*Harry E. Karr* (with a brief by *Benson & Karr* and *John D. Nock*), for the appellee.

BURKE, J., delivered the opinion of the Court.

It was provided by section 1 of Chapter 693 of the Acts of 1912: "That no dwelling house shall be erected within that section of Baltimore City embraced within the follow-

ing lines: Beginning at the intersection of the western city boundary and Forest Park avenue, and running thence easterly along Forest Park avenue to Garrison avenue; thence southerly along Garrison avenue to Duvall avenue; thence westerly along Duvall avenue to the western city boundary, and thence northerly to the place of beginning, unless the same is constructed as a separate and unattached building; and if such dwellings are of frame construction they shall be at least twenty feet apart, and if of stone or brick construction they shall be at least ten feet apart."

The Maryland Realty Company, a body corporate, and the appellee on this record, is the owner of a lot in fee, for which it paid fifteen thousand dollars, lying within the limits described in the Act. The lot has a frontage of two hundred and fifty-nine feet and three inches on the west side of Garrison avenue between Dalrymple avenue and Bonner road, with an average depth of from one hundred feet to one hundred and sixty-seven feet and three inches to a ten foot alley. The appellee desired to improve its lot by the erection thereon of semi-detached two-story, slag roof, brick dwellings, and, after securing a permit from the Appeal Tax Court, it filed with James J. Byrne, the Inspector of Buildings of Baltimore City, plans and specifications showing the character of buildings it proposed to erect subject to the supervision of the Building Inspector and in conformity with the building laws of Baltimore City. Mr. Byrne, the Inspector of Buildings, refused to issue a permit for the erection of the proposed buildings. The appellee thereupon filed a petition for mandamus in the Court of Common Pleas of Baltimore City against him to compel the issuing of the permit for the erection of the buildings shown on the plans and specifications filed with him. Mr. Byrne, the inspector, showed that he refused to issue the permit for the following reasons set out in his answer: "That the granting or refusing of said permit, as asked for, involves the question of the construction of a class of improvements which, under all the

circumstances, would be highly detrimental to one of the largest, most beautiful and artistically developed suburban communities, constituting the suburbs of the City of Baltimore, as is evidenced by resolution of the Forest Park Improvement Association, passed on the 22nd day of June, 1915, a copy of which is filed herewith, and prayed to be taken as a part of this answer and marked 'Respondent's Exhibit A'; that further answering, this respondent shows that, aside from the question of policy and wisdom, your respondent could not grant the permit applied for in the premises, because the buildings and improvements contemplated by the petitioner violate the provisions of Chapter 693 of the Acts of the General Assembly of Maryland for the year 1912, and this respondent is advised that said Act is in full force and effect and is valid and constitutional."

The resolution of the Forest Park Improvement Association filed with his answer states fully and clearly all the reasons which have been or can be urged in support of the refusal of the appellant to issue the permit. The material portion of the resolution is here inserted:

"Whereas, Garrison avenue is the most attractive avenue in Baltimore City, being eighty feet wide and most of it more than four hundred feet above tide level, winding its way for more than two miles through the sections known as Beulah Villas, Mont Alto, Brookline, Forest Park and Lenox to West Arlington on the North, and on and near which avenue are located the finest frame cottage residences within the limits of Baltimore City, each situated within its own grounds and having beautiful and well-kept lawns, hedges, shrubberies and flowers, said avenue being under the especial care of the City Forester, who has caused fine shade trees to be planted on each side of the avenue thirty feet apart; such avenue being as yet wholly free from this cheap, two-story development of congested dwellings, which, however proper they may be in the central section of the city, are

very detrimental and undesirable in this northwest corner of the city, devoted as it is to cottage and park-like development, and which are particularly undesirable on beautiful Garrison avenue; and

"Whereas, it appears that the Building Inspector has refused to issue said permit because of an Act of the General Assembly of Maryland, passed in 1912, and known as Chapter 693, wherein it is provided that no such dwelling houses shall be erected within a certain area embracing this particular place where the said Realty Company contemplate erecting these cheap, two-story dwellings; and

"Whereas, said Act of 1912 was passed at the solicitation of this Association, the members of which called the attention of the members of the Legislature to the fact that the area embraced by the Act seemed to be the only one in the vast area of many hundreds of acres unprovided with adequate building restrictions, and particularly called attention to the language used by your Court of Appeals in the case of *Cochran v. Preston,* in 108 Maryland, at page 229, which says: 'It may be that in the development of a higher civilization, the culture and refinement of the people has reached the point where the educational value of the Fine Arts, as expressed and embodied in architectural symmetry and harmony, is so well recognized as to give sanction, under some circumstances, to the exercise of this power even for such purposes' (the power referred to being the enforcement of a legislative conception of artistic beauty and symmetry), 'though it was also pointed out to the members of the General Assembly by the members of this Association that this area, covered as it is by frame cottages and surrounded by hundreds of acres of other frame cottages, should be protected by the Act from fire risk as much as possible, and also because of the lack of sewer facilities it should not be too closely built upon, and further, that there would be vast property loss and loss to the taxable basis to permit in this cottage neighbor-

hood, these dreaded spots of the two-story house development; and

"Whereas, this Association is anxious to impress the Executive and Judicial departments of our Government, the same as it did the legislative branch, with the belief that in this section of Baltimore, at least, civilization has reached the point where the educational value of the Fine Arts as expressed and embodied in architectural symmetry and harmony and in the health-giving spaces of green grass and freedom from congestion and pollution from numerous cesspools and a lessened danger of fires, makes the Act of 1912 a highly beneficial and salutary one."

Testimony was taken by the respective parties, and the case was argued and submitted. On December 31, 1915, the Court ordered the writ of mandamus to issue as prayed, and from that order the present appeal was taken.

The Record shows that the appellee's lot is bounded by Garrison avenue on the front and by Winfield avenue on the back, and by Bonner road on the south and Dalrymple avenue of the north. In the same square in which the appellee's lot is located there is erected a Sunday School building constructed partly with concrete blocks and with wood and shingles. To the south of Bonner road facing the lot in question, there are six inexpensive frame cottages. On the southwest corner of Winfield avenue and Dalrymple avenue there is a solid row of two-story brick houses of twenty-one feet front. On Dalrymple avenue between Winfield and Garrison avenue there have been erected twelve semi-detached two-story brick front porch houses, with bay windows, and in close proximity of the lot there are a number of other two-story brick houses.

The character of houses which the appellee is asking to build upon his property is described by the witnesses as two-story brick semi-detached houses with front and rear porches, bay windows on the front, heated by steam, and to cost about

twenty-five hundred dollars each to build. It is stated that they would have ornamental fronts and would make attractive houses, thoroughly modern and up to date, and would have a ten years' guaranteed slag roof, and that they would be equal, if not better, than the same character of houses already erected in the neighborhood. The houses would be semi-detached, that is, would be built in pairs, with a distance of eight feet between each pair of houses, and would front on Garrison avenue. The Records shows that, because of the class of buildings surrounding the lot and in close proximity thereto on the south, west and north, the only business-like method of improving the lot is by the class of improvements proposed, and that it would be financial suicide to erect cottages on the lot with a view of selling them.

There was some suggestion in the testimony that houses such as it is proposed to erect upon this lot would be a menace to the public health, and, therefore, their erection might be prohibited under the police power for these reasons. But there is no substantial support for this contention on the facts. There is nothing inherently dangerous to the public safety or the public health in properly constructed semi-detached brick houses, and to prohibit their construction upon this ground would be carrying the police power to an extent that would alarm the public. There is no authority for such a proposition in this State, and we have found no American case to support it. So far as fire risk is concerned, the facts show that the proposed houses would be less dangerous than the frame cottages in the neighborhood.

Garrison avenue and the character of the improvements along that avenue from Walbrook Junction are fairly accurately described in the resolution of the Forest Park Improvement Association. It is a fine avenue and the houses fronting on it are attractive and beautiful, and there can be no doubt that a majority of the residents there are opposed to the building of these proposed houses. It would appear, however, that the extent of depreciation to property on the

avenue has been very much exaggerated. It is doubtful if the proposed construction would have any appreciable injurious effect upon the property on either side of the avenue lying between Walbrook Junction and Clayton road. It would undoubtedly be objectionable to some residents in close proximity to it, and it would undoubtedly depreciate to some extent the value of some property. But this Court has no power under the plain and settled rules of law to prevent the construction of the houses. The Legislature had no power to pass the Act. The Act does not relate to the police power, and its enforcement would deprive the appellee of property rights guaranteed by the Constitution, which cannot be invaded for purely esthetic purposes under the guise of police power. It is said in *Bostock* v. *Sams,* 95 Md. 400, that: "It cannot be pretended that the citizen has not the common law right to acquire title to a lot of land, qualified or absolute, in a city as elsewhere and to build upon and improve it as his taste, his convenience or his interest may suggest or as his means may justify without taking into consideration whether his buildings and improvements will conform in 'size, general character and appearance' to the 'general character of the buildings previously erected in the same locality;' even though there might be those in whose 'judgment' his so building might in some way 'tend to depreciate the value of surrounding improved or unimproved property."

In *Haller Sign Works* v. *Physical Culture Training School,* 249 Ill. 436, the Court declared void the statute forbidding under penalty the erection and maintenance of any structure for advertising purposes within five hundred feet of any park or boulevard. In the course of the opinion the Court said: "It is sought to sustain the validity of this Act as a proper exercise of the police power of the State. The natural right every citizen has to use his property according to his own will is necessarily subject to the limitation that in such use others shall not be injured.

All uses of property or courses of conduct which are injurious to the health, comfort, safety and welfare of society

may be prohibited under the sovereign power of the State, even though the exercise of such power may result in inconvenience or loss to individuals. In this respect individual rights must be subordinate to the higher rights of the public. The power that the State may exercise in this regard is the overruling law of necessity, and is founded upon the maxim, *Salus populi est suprema lex.* The existence and exercise of this power are an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders all private rights to exercise of which would prove hurtful to the citizens generally. *Chicago* v. *Rogers Park Water Co.,* 214 Ill. 212, 73 N. E. 375; *Mugler* v. *Kansas,* 123 U. S. 623, 31 L. Ed. 205, 8 Supreme Ct. Rep. 273.

While the general principle above announced is uniformally recognized, it is equally true that the owner of property has the right to make any use of it he desires, that does not endanger or threaten the safety, health, comfort or general welfare of the public.

It does not follow that because a statute has been enacted for the ostensible purpose of guarding the safety, health, comfort or promoting the general welfare, it must be accepted as a proper exercise of the police power of the State; nor can a statute which is, in fact, a proper exercise of such power, be declared void merely because it results in circumscribing limits of individual conduct to narrower bounds. Necessarily there are limits beyond which legislation cannot constitutionally go in depriving individuals of their natural rights and liberties. To determine where the rights of the individual end, and those of the public begin, is a question which must be determined by the courts. The Constitution is the highest written law of the State. The courts must obey both the Constitution and the statutes, but in case of conflict between the two, the Constitution must control, and the statute must give way. When there has been an attempt to exercise the police power of the State by the law-making department of the government, and the validity of such Act is challenged as being an unreasonable invasion of private rights, the

courts must, upon their own responsibility, determine whether in the particular case the constitutional limits have been passed. *Sinking Fund Cases,* 99 U. S. 700. "* * * The citizen has always been supposed to be free to determine the style of architecture of his house, the color of the paint that he puts thereon, the number and character of trees he will plant, the style and quality of the clothes that he and his family will wear, and it has never been thought that the Legislature could invade private rights so far as to prescribe the course to be pursued in these and other like matters, although the highly cultured may find on every street in every town and city many things that are not only open to criticism, but shocking to the esthetic taste. The courts of this country have with great unanimity held that the police power cannot interfere with private property rights for purely esthetic purposes." There are many other cases distinctly holding that the police power cannot be exercised for purely esthetic purposes. *Welch* v. *Swasey,* 214 U. S. 90; *Commonwealth* v. *Boston Adv. Co.,* 188 Mass. 348. In the note to *State* v. *Whitlock,* 149 N. C. 542, reported in 16 *Am. & Eng. Annotated Cases,* 765, it is said: "While the promotion of esthetic or artistic considerations is a proper object of governmental care, these considerations alone will not justify, as an exercise of police power, a radical restriction of the right of an owner of property to use his property in an ordinary and beneficial way." Following this note and in the cases to which we have referred will be found a long line of cases holding that the police power cannot be exercised merely for esthetic considerations, and we have not found any cases to the contrary. The reasons for this rule is well stated in *Quintini* v. *City of Bay St. Louis,* 64 Miss. 483, S. C., 1 *Southern Reporter.* 625: "The law can know no distinction between citizens because of the superior cultivation of the one over the other. It is with common humanity that courts and legislatures must deal; and that use of property which in all common sense and reason is not a

nuisance to the average man cannot be prohibited because repugnant to some sentiment of a particular class."

To support the statute, counsel for the appellant referred to *C. B. & Q. R. W. Co.* v. *Drainage Commissioners,* 200 U. S. 562, and to *Noble State Bank* v. *Haskell,* 219 U. S. 111, and they rely upon certain general language of the Court in those cases, which if disconnected from the context and read apart from the facts of the cases, would confer upon the Legislature almost unlimited power, and would authorize it in the name of the police power to overturn the foundations of constitutional government. But when the language of the Court is read in the light of the fact with which it was dealing it is clear that the Court did not intend to lay down any new doctrine of the police power. In *Baltimore & Ohio Railroad* v. *Waters,* 105 Md. 396, JUDGE PEARCE said: "The counsel for the appellee lay much stress upon the case of *C. B. & Q. R. W.* v. *Drainage Commissioners,* 200 U. S. 592, in which the Court said that the police power embraced regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety."

In that case a public corporation, charged by law with the duty of causing a large body of swamp lands to be drained and made capable of cultivation, adopted a plan which required the enlarging and deepening of the channel of a natural water course running through the district, the best and only practicable mode of effecting the drainage. This plan also required the removal of the foundations of a bridge erected by the defendant railway over this water course, which the railway company refused to do, or permit to be done until it was paid such a sum as would compensate it for the cost of removal and of constructing a new bridge over the widened and deepened stream. It was held by the Court that the drainage of so large a body of lands "so as to make them fit for human habitation, is a public purpose, to

accomplish which the State may, by appropriate agencies exert the general powers it possesses for the common good."

In *Noble State Bank* v. *Haskell, supra,* in which MR. JUSTICE HOLMES said that the police power "may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare," the Court was dealing with "the police power of the State of Oklahoma to regulate banking within the State, and to provide guaranties under the authority of the State and under its direction against the insolvency of banks organized, maintained and operated with the sanction and under the authority of the State. It was held that the statutory provision for compulsory assessments, for the purpose of making up the guaranty fund so provided to be paid by the various banking institutions, was, under all the circumstances, within the police power of the State. That the Court did not understand that it was announcing any new doctrine, or unduly extending the accepted doctrine of the police power, is evident from the opinion of JUSTICE HOLMES filed on the motion for a rehearing of that case. After saying that the judgment delivered "seems to have conveyed a wrong impression of the opinion of the Court in some details," and after referring to certain cases cited in the opinion, he said that those cases "were cited to establish, not that property might be taken for a private use, but that among the public uses for which it might be taken were some which, if looked at only in their immediate aspect, according to the proximate effect of taking, might seem to be private. This case in our opinion is of that sort. The analysis of the police power, whether correct or not, was intended to indicate an interpretation of what has taken place in the past, not to give a new or wider scope to the power." The facts of the two last cited cases are so widely different from those of the case before us as to deprive them of any application to this case.

In *Shaffer & Munn* v. *Union Ming. Company,* 55 Md. 80, this Court quoted with approval the following passage from *Cooley's Constitutional Limitation*: "To forbid an individual, or a class, the right to the acquisition or enjoyment of property, in such manner as should be permitted to the community at large, would be to deprive them of *liberty,* in particulars of primary importance to their pursuit of happiness."

In *Lawton* v. *Steele,* 152 U. S. 133, the Supreme Court said: "To justify the State in thus interposing its authority in behalf of the public, it must appear first, that *the interests of the public generally, as distinguished from those of a particular class,* require such interference; and, secondly, that the means are reasonably necessary for the accomplishment of the purposes and not unduly oppressive upon individuals." From the facts of these cases cited, it must be apparent that under the firmly settled principles of law, which it is our duty to maintain, that Chapter 693 of the Acts of 1912 is invalid, and as that is the sole question of law presented in this appeal, the order appealed from must be affirmed.

> *Order affirmed, the appellant to pay the costs above and below.*