BROOKS *v.* FAIRMAN, ET AL.

[No. 202, September Term, 1968.]

*Decided May 9, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*James S. McAuliffe, Jr.,* with whom were *Heeney, McAuliffe & McAuliffe* on the brief, for appellant.

*Robert J. Stanford,* with whom were *Myer E. Grossfeld* and *Paul M. Parent* on the brief, for appellees.

McWilliams, J., delivered the opinion of the Court.

To borrow an expression from the jargon of the negligence specialists the appellee (Fairman) was "rear-ended" by the appellant (Brooks). Brooks complains that the verdict of the jury, $10,000, was unduly inflated by the admission of a doctor's bill not shown to be either necessary or reasonable. He has other complaints but since they appear to be little more than make-weights we shall touch upon them but briefly.

At 10:15 p.m. on 29 September 1964 rain was falling and Fairman, at the wheel of a taxicab owned by Burger, whose administrator is the other appellee, was driving south on Wisconsin Avenue in Montgomery County. As he approached Bradley Boulevard he saw the red light of the traffic signal controlling the intersection. He "made a normal stop," put the gear shifting lever in the neutral position and removed his foot from the brake pedal. Five or six seconds later he was struck in the rear by a vehicle driven by Brooks who insists that the light was green, that he had been approaching the intersection at a speed of 25 to 30 miles per hour, that he first observed Fairman stopped or stopping when he was 75 to 100 feet distant and that "as soon as * * * [he] became aware that * * * [he] was catching up [to Fairman] * * * [he] put on * * * [his] brakes but the distance was too short for * * * [him] to stop in time to avoid hitting the rear of the [taxi]cab." Fairman's suit for damages, filed originally in Montgomery County, was removed to the Circuit Court for Wicomico County for trial which took place on 20 May 1968 before Travers, J., and a jury. On the day following, at the conclusion of the plaintiff's testimony, Judge Travers directed a verdict in favor of Brooks in respect of the claim of Burger's estate. At the conclusion of all of the testimony Judge Travers refused to direct a verdict for Brooks on his counterclaim, directing instead a verdict in favor of Fairman and Burger. He also directed a verdict in favor of Fairman against Brooks on the question of liability and submitted the matter of damages to the determination of the jury. There is no appeal from the direc-

tion of the verdict (in Burger's suit against Brooks) in favor of Brooks against Burger. Indeed, there is no judgment from which to appeal.

## I.

We shall deal first with the direction of the verdicts in favor of Fairman against Brooks on the issues of primary negligence and contributory negligence keeping in mind, of course, the familiar rule that we must consider the evidence in a light most favorable to the party against whom the motion is made. *Deremer v. Liston,* 252 Md. 571 (1969). We had no difficulty concluding, as far as this record is concerned, that Fairman's presence at the scene was his only contribution to the happening of the accident. Brooks' contention that the traffic light was green, while it contradicts Fairman's testimony that it was red, contributes nothing to the posture he seeks to assume. He admitted Fairman came to a "normal," rather than a sudden, stop and that he first saw him 75 to 100 feet away while moving at a speed of only 25 to 30 miles per hour. Furthermore, Brooks himself introduced into evidence the accident report which states, under the heading "Violations Indicated," that he "disregarded" the automatic traffic control signal. Our examination of the record fully persuades us that Judge Travers' direction of the verdicts was not erroneous. *See Deremer v. Liston, supra; Pyle v. Lee,* 250 Md. 315 (1968) ; *Gutterman v. Biggs,* 249 Md. 421 (1968) ; *Todd v. Ferrell,* 212 Md. 574 (1957).

## II.

Fairman testified that he consulted Dr. Saul Holtzman on the day following the accident. He had been to Dr. Holtzman before that on account of injuries sustained in "a similar case on May 15th [4½ months earlier] [in] which a man had run through" a stop sign and "hit * * * [his] head on the side * * *." He said he had "been seeing * * * [Dr. Holtzman] over a period of time" and that "periodically" he was still going. On 15 September 1966, about two years after the accident, he consulted Dr. Glenn G. Reynolds. Dr. Reynolds was produced as a witness for Fairman. Dr. Holtzman was not called to testify. After relating the details of his examination and

treatment of Fairman and the reasonableness of his medical charges, Dr. Reynolds testified as follows:

"Q. Doctor, you have told us that patient [Fairman] was referred to you by Doctor Holtzman. Are you familiar with Doctor Holtzman's practice?

"A. I know Doctor Holtzman, yes.

"Q. And what is his specialty?

"A. Internal medicine.

"Q. Doctor, presuming that Doctor Holtzman gave initial complete examination on September 30, 1964, had X-rays of cervical spine, the lumbosacral spine and chest, and thereafter gave a total of *seventy-seven* visits and two additional X-rays of the neck, can you say with reasonable medical certainty that a bill of $935.00 is reasonable? [Emphasis added.]

"Mr. McAuliffe [for appellant]: *I object for several reasons,* if the Court please. First of all is that the question is a hypothetical question which assumes facts not in evidence. *There is no evidence before this Court as to the number of treatments rendered by this doctor.* [Emphasis added.]

"The Court: *I noticed that.* I didn't notice any examination, really. [Emphasis added.]

"Mr. McAuliffe: That is right, Your Honor. Now, for the further reason that, again on April 3, the statement was furnished me medical bills from Doctor Holtzman at $645 to date. This is April 3, 1968, $645. And bill in the amount of six hundred forty-five was furnished me within the last week. For both reasons and the additional reason that Doctor Reynolds did not come in this case until two years after Doctor Holtzman started treating this man, I believe that he is totally unqualified to testify. He has no personal knowledge as to what Doctor Holtzman did and I don't believe a proper question to ask this doctor to testify."

\* \* \*

"Mr. Auliffe: *I very much want to have the opportunity to ask Doctor Holtzman about all seventy-*

*seven visits,* if the Court please, and this is a way of preventing me from having my opportunity to ask Doctor Holtzman these questions. [Emphasis added.]

"Mr. Stanford [for appellee] : Doctor Holtzman is in Washington, D. C. He is not subject to the summons of the court. If he were subject, he would be here today.

"The Court: *I will permit up to the amount stated in the interrogatories but no more."* (Emphasis added.)

The only other testimony in respect of the number of times Fairman was treated by Dr. Holtzman came from Fairman himself and, as we have said, it consists of nothing more than a general statement that he had been "seeing" the doctor "for a period of time" and that "periodically" he was still going to him. Nowhere else in the transcript is there testimony bearing on the exact number of visits made by Fairman to Dr. Holtzman nor is there anything establishing their necessity.

Brooks contends that the admission of the $645 bill of Dr. Holtzman was improper because the only testimony supporting it was that of Dr. Reynolds who, he points out, did not begin to treat Fairman until two years after the accident. Moreover, he says, Dr. Reynolds had no personal knowledge of the services rendered by Dr. Holtzman ; he could not know if they were necessary or whether they were the result of the 15 May accident or of the 29 September accident or both. Fairman argues that it was unnecessary to elicit testimony in respect of the number of visits he made to Dr. Holtzman since there were itemized medical bills showing the number of visits and the charges made therefor. The medical bills, however, were not admitted in evidence; they were merely marked for identification. But Fairman contends that Brooks' counsel acknowledged that seventy-seven visits had been made. A review of the testimony set forth above, however, shows that the number of visits was first raised by Fairman in an improper hypothetical question to Dr. Reynolds. Counsel's subsequent comment that he desired to examine Dr. Holtzman about "all seventy-seven visits" can hardly be construed to be an admission. *Compare*

*Secor v. Brown,* 221 Md. 119 (1959). Since there was no testimony as to the number or necessity of the visits Fairman made to Dr. Holtzman or the reasonableness of his charges, Brooks' motion to strike Dr. Reynolds' testimony in this regard should have been granted. *Metropolitan Auto Sales Corp. v. Koneski,* 252 Md. 145, 154 (1969) ; *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 208 (1961) ; *Washington, Baltimore & Annapolis Elec. R.R. v. Kimmey,* 141 Md. 243 (1922).

It would be inappropriate merely to reduce the judgment by the amount of the charges as we did in *Metropolitan Auto Sales v. Koneski, supra,* since in the case at bar the jury could hardly have been unaware of the amount of Dr. Holtzman's charges in the course of determining the amount of damages sustained by Fairman. In *Metropolitan Auto Sales v. Koneski* it was most unlikely the admission of the hospital bill in the husband's suit for loss of consortium and the recovery of out-of-pocket expenses had an inflationary effect on the amount of damages awarded to the wife in her suit. In the case at bar, however, the jury's verdict ($10,000) may indeed reflect, to some extent, the charges of Dr. Holtzman.

## III.

Since the case will be remanded for a new trial on the issue of damages only, it is unnecessary for us to consider the other issues raised by Brooks, especially since it is hardly likely they will again be presented in quite the same manner. Nonetheless, the court and counsel, in dealing with the matter of damages resulting from Fairman's alleged loss of earning capacity, may find it helpful to bear in mind the following language in our recent decision in *Bender v. Popp,* 246 Md. 65, 71 (1967) :

> "There was medical evidence in the record, as well as the plaintiff's testimony, describing her subjective complaints as to the exhaustion, pain, headaches and limitation of the motion of her neck, all of which presented facts from which a reasonable inference could have been drawn that her range of job opportunities and earning capacity would be affected by the injury."

The Court at 73 went on to quote from *Adams v. Benson*, 208 Md. 261, 272-73 (1955), as follows:

"The determination of the extent of impairment of earning power as a result of injury, although involving contingencies and matters of opinion, is an ordinary function of the triers of fact. In many cases evidence of salary, wages, or other income derived from personal services, earned by a plaintiff before and after sustaining an injury, is available for the purpose of comparison in proof of diminished earning power; *but such a comparison is not essential to proof of diminished earning power, but all relevant facts must be considered. * * *.*"

For the reasons stated the judgment of the court below will be affirmed in part and reversed in part and the case will be remanded for a new trial on the issue of damages alone.

> *Judgment affirmed in part and reversed in part. Case remanded for a new trial on the issue of damages alone. Costs to be paid by the appellant.*