# WORTHINGTON CONSTRUCTION CORPORATION
## v. MOORE ET UX.

[No. 365, September Term, 1971.]

*Decided June 9, 1972.*

The cause was argued before HAMMOND, C. J., ▌ and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and JAMES MACGILL, Chief Judge of the Fifth Judicial Circuit, specially assigned.

*Robert E. Powell,* with whom were *Howard G. Goldberg* and *Smith, Somerville & Case* on the brief, for appellant.

*Phineas S. Dixon,* with whom were *Muhl, Dixon & Westheimer* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

Mr. and Mrs. Robert W. Moore, appellees, in June 1965 purchased a newly built house in Ellicott City, Maryland, from appellant, the Worthington Construction Corporation. When the Moores observed the presence of water in the basement of their home, they called upon Worthington to rectify the problem. But corrective action failed and suit was instituted in the Circuit Court for Howard County. The case was later removed to the Circuit Court for Baltimore County and tried in June 1971 before Judge Menchine and a jury. There, appellees sought to recover for the damage caused by water penetrating into their basement—a condition they contend resulted from Worthington's faulty construction of their home. When the trial judge denied appellant's motion for a directed verdict at the close of all evidence, the case was submitted to the jury and it returned a $6,000 verdict in favor of the Moores. Subsequent motions for a judgment n.o.v. or alternatively a new trial were denied and final judgment on the verdict entered. This appeal follows.

The only question presented for our consideration is whether the evidence was legally sufficient to allow the trial judge to submit the case to the jury for its determination. In responding to this inquiry it is necessary for us to journey through the record. During our trek we must be guided by the familiar principle that requires us to consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to the Moores, the party opposing the motion. *Brooks v. Fairman,* 253 Md. 471, 252 A. 2d 865 (1969); *Deremer v. Liston,* 252 Md. 571, 250 A. 2d 622 (1969); *Wood v. Johnson,* 242 Md. 446, 219 A. 2d 231 (1966).

At the outset we put aside those matters which are not dispositive of the issue before us. We observe there was no express warranty in the contract which guaranteed a water free basement. And, it is clearly established in this State that except in unusual circumstances, not present here, there are no implied warranties in the sale

of real estate. *Thomas v. Cryer,* 251 Md. 725, 248 A. 2d 795 (1965) and cases cited therein. However, an obligation to use ordinary skill and care in constructing a house or performing other work is implied by law independent of any contract.[1] *Gaybis v. Palm,* 201 Md. 78, 85, 93 A. 2d 269 (1952).

The Moores apparently recognize these legal limitations upon them and accordingly have proceeded on a negligence theory alleging that the damage of which they complain was caused by appellant's failure to exercise ordinary skill and care in constructing their home. They attempted to satisfy the burden of establishing negligence through their own testimony and that of two expert witnesses, Louis Coates and Arthur Choyce. To succeed on their claim more than a mere scintilla of evidence must be present, *i.e.,* evidence having legal probative force and value. *Arshack v. Carl M. Freeman Assoc.,* 260 Md. 269, 276-78, 272 A. 2d 30 (1971) ; *Fowler v. Smith,* 240 Md. 240, 247, 213 A. 2d 549 (1965). Our task is to determine if the Moores met this burden with legally sufficient evidence that rises above the level of pure surmise, possibility or conjecture; we conclude they have not.

When appellees testified, they did not discuss the technical aspects of their problem, instead, they related the factual background of the claim—the extent and longevity of the water leakage and the damage it allegedly caused. Additionally Mr. Moore said that a year after he moved into the house he drilled through the basement floor and found "water, spring water." He also stated that the trouble was at least partially caused by Worthington's failure to properly grade the land surrounding the house. Moore testified that in an attempt to prevent the leakage he regraded this area, but his efforts were basically unsuccessful.

Mr. Coates, the Building Engineer and Supervisor of

---

1. It should be noted the Moores purchased the house prior to the effective date of Ch. 151, § 1 of the Laws of Maryland 1970, now Code (1957, 1971 Cum. Supp.) Art. 21, § 95 b.

Inspectors for Howard County, added little if anything to aid appellees' cause. This witness said he only visited the Moores' property on one occasion, after they moved in, since he had not been the individual charged with inspecting their house as it was being constructed. However, this expert testified that his review of the official inspection records indicated construction had proceeded in accordance with the building requirements of the county. He also stated that while at the house he observed some "flood puddles" on the basement floor but was unable to identify their source. Mr. Coates was interrogated further:

"Q. You say you did inspect the walls?
A. Yes, sir.
Q. Was there any moisture in or on the walls?
A. Yes, there were.
Q. Was it in the wall?
A. Well, it was, evidently, coming down from the interior of the walls, not coming through, I don't think. I had no way of telling, but it appeared to be, mainly, condensation.
\* \* \*
Q. Did you observe any condition around the house which might have—when I say around the house, I am talking about the outside grounds—which might have caused water to come into the basement?
A. No.
\* \* \*
Q. Well, is it your opinion that that much water could be condensation?
A. Well, it can be quite a bit because what it does, it forms and runs down the wall and then runs across the floor, sir, and if you have a very hard surface floor, why, it doesn't tend to settle into it, so it could be

both a leak and condensation. I couldn't positively say that." [2]

The crucial witness was Arthur Choyce, an expert having thirty-two years' experience in the construction business, who at trial offered his opinion concerning the Moores' water problem. It is upon his testimony that appellees' case must ultimately sink or swim. He first related the normal procedures followed in the industry for insulating walls and also testified as to the methods for waterproofing a basement floor.

> "Q. Now, Mr. Choyce, is there anything done under the basement floor, under a basement floor, normally, to insure waterproofing?
> A. Well, normally, a moisture condition or water condition under the floor, we would put four inches of, probably, gravel to allow the moisture to go to the sump pump, and a layer of polyethylene plastic of four-thousands or six-thousands thickness on top of the gravel; that would be between the cement and the gravel."

But this witness conceded he was unable to testify as to how in fact the walls and floor were actually constructed; whether they conformed to the reasonable standards of the trade, and if not, whether this caused the water leakage. He was cross-examined as follows:

> "Q. When you went . . . there, did you dig down and explore the foundations of this house?
> A. No.
> Q. You have no knowledge whatsoever as to what waterproofing was put on the outside of that house, do you?
> A. No, I don't.

---

2. Judge Menchine, without objection, instructed the jury that they were not to award damages for any injury caused by condensation because there was no legally sufficient evidence to establish that this resulted from appellant's negligence.

Q. And did you drill through the floor to ascertain what insulation, if any, was put underneath that house?

A. No.

Q. And you have no knowledge whatsoever as to what insulation, if any, was put under that house, do you?

A. That's right."

However, Mr. Choyce did relate that he thoroughly inspected the interior of the basement and the grading of the land surrounding the house. Inquiry was made concerning his observations and opinions:

"Q. Did you find evidence of water or moisture in the walls?

A. Yes, sir, water was seeping out of the walls.

Q. Was it general or was it from some particular place?

A. No, it was on the high side of the foundation where the dirt was the highest, and that would be the back, and facing the house, would have been on the righthand end. That is where the grade is awfully high on the house, and, also, the floor, I might add.

Q. Were there cracks in the floor?

A. Yes, there were.[3]

Q. Was there water coming from the cracks in the floor?

A. At that time it was, yes, sir.

* * *

Q. Mr. Choyce, in your opinion as a builder, what, in your opinion, or where was the water coming from that you found in the basement or moisture?

A. Some of the water was coming out of the

---

3. Although there was a dispute as to the size of these cracks, it was not established that they were caused by Worthington's negligence. According to expert testimony it is not unusual for linear cracks to develop in concrete floors when the house settles.

floor and some was coming out of the wall and some was condensation.

\* \* \*

Q. Are you able, Mr. Choyce, as the result of your examination only, to express an opinion on the basis of that examination whether or not the floor and the walls of this particular dwelling were done in a good and workmanlike manner by the builder?

A. No, I feel they were not.

\* \* \*

Q. What leads you to that opinion, Mr. Choyce?

A. Well, first, the floor is graded away from the sump pump. . . . The floor should be graded to the sump pump. The block work, in my opinion, I consider very shabby, the mortar in the block work, which is an invitation for leakage. I don't say that Worthington houses are all like this, but, surely this one is not a good one, in my opinion."

A question by Judge Menchine was intended to elicit further elaboration of this last answer.

"Q. Now, when you said that the block work was shabby and the mortar is shabby, what did you mean by that and how, if at all, does this influence or affect the water and moisture condition?

A. *This could cause wall leakage if the mortar is the same condition on the outside of the wall. Of course, it is supposed to be parged with cement. I haven't seen the outside,* but it's a rough block job, in my opinion." (Emphasis added.)

Mr. Choyce did examine the outside area surrounding the house and was questioned about the grading:

"Q. In your opinion, is the grade, or, present

grade outside of the home causing any of the water problems?

A. When I looked at it, and I am talking about '66-67, the entire grade of the back of the house was running the water against the back wall. There was no way for the water to escape. It had to go against the wall, and then run away instead of being—it should be swaled away from the house like Mr. Moore was talking about, which I understand he has done some of now, but I haven't seen that, but it was graded improperly.
* * *

Q. And do you have an opinion that you can express with reasonable certainty as to what was the cause of that soaking wet wall and the basement floor?

A. I feel the wall is leaking due to the high hill behind it. The hill is tremendous that goes up in the woods and I, also, feel that there is water under the floor. To be coming out of the cracks, it has to be water under the floor. I think this is creating a real problem, and if the back yard had been graded away from the house instead of falling directly to it, it would have helped a whole lot, I am sure.
* * *

Q. Would you be able, in general terms, to describe for the members of the jury the manner in which the grade exists commencing at a point at the house wall and extending down to the back of the lot? Is it uniform in terrain?

A. No, the entire house was on a hillside. The front lawn is rather level, then the house, and the back goes up tremendous, up a hill, and it fell directly against the back wall of the house. Instead of grading away from the

house and going up, it went right straight into the house.

Q. Well, is there any break in that grade from the peak at the back of the lot to the house itself?

A. No, I think it goes continuously up, if I'm not mistaken. I never walked up the lot. You can see the tremendous incline.

Q. But there is no swale intervening?

A. No, sir."

Our examination of this evidence, viewed in a light most favorable to appellees, exposes a fatal defect in their claim—the failure to prove that appellant's negligence was the proximate cause of the harm. *Peterson v. Underwood*, 258 Md. 9, 15, 264 A. 2d 851 (1970). The Moores need not have proved their case by direct testimony because reasonable inferences may be utilized to satisfy this burden. However, such inferences must create a probable cause-effect relationship. *Peterson v. Underwood, supra* at 17. It is impermissible to ever allow a jury to render a verdict based on unsupported conjecture.

In this case there is no testimony whatsoever which demonstrates that the negligence of appellant caused the water problem. The fact that the floor is graded away from the sump pump is irrelevant because this defect merely prevents water already present in the basement from being removed automatically. It in no way aids the Moores because they are not suing for water remaining in the basement but only for the defective construction that permits water to enter there. Furthermore, Choyce's examination of the basement's interior surface is not probative of nor does it permit the inference that the exterior of the walls were negligently built. This expert witness's own words establish that the condition on the outside is determinative of whether defective construction permitted the water penetration. He said that "if the mortar is the same . . . condition on the outside" it could cause leakage but "I haven't seen the outside." Since

Choyce admitted he was totally ignorant concerning the parging and waterproofing of the walls, the footings and foundation, as well as the drain tile under the floor, there is no evidential value to any opinion he gave in regard to what caused the water penetration. An expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions. *Stickell v. City of Baltimore*, 252 Md. 464, 474, 250 A. 2d 541 (1969) ; *State Health Dept. v. Walker*, 238 Md. 512, 520, 209 A. 2d 555 (1965) ; *State, Use of Stickley v. Critzer*, 230 Md. 286, 290, 186 A. 2d 586 (1962). Here the very groundwork for his opinion is inadequately supported.

Even if we assume appellees have presented legally sufficient evidence which establishes that Worthington improperly graded the back yard and such a negligent act caused the water penetration into the basement, the Moores still cannot recover. This is so because they have neglected to show what expenditures are necessary to correct the error by a regrading of the land.

It is impermissible to allow a jury to determine whether the walls and floor of this basement were properly constructed and insulated since there was no probative evidence to guide it in arriving at a decision. Therefore, Judge Menchine should have preempted the jury's prerogative and directed a verdict for appellant.

*Judgment reversed without a new trial.*
*Costs to be paid by appellees.*