## BROADVIEW APARTMENTS COMPANY v. COMMISSION FOR HISTORICAL AND ARCHITECTURAL PRESERVATION

[No. 1296, September Term, 1980.]

*Decided September 3, 1981.*

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*Charles C. W. Atwater,* with whom was *Robert L. Fila* on the brief, for appellant.

*Sandra R. Gutman, Assistant Solicitor for Baltimore City,* with whom were *Benjamin L. Brown, City Solicitor for*

*Baltimore City,* and *Ambrose T. Hartman, Deputy City Solicitor for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Broadview Apartments Company (Broadview), the appellant, appeals from an order of the Baltimore City Court which affirmed the denial by Baltimore City's Commission for Historical and Architectural Preservation (CHAP), the appellee, of a permit to demolish a structure, owned by Broadview, which had been designated a landmark under the City's preservation law, Art. 1, § 40 of the Baltimore City Code. Broadview contends that:

1. CHAP's decision denying the permit was arbitrary, capricious, and not supported by substantial evidence;

2. The preservation law does not provide objective standards for its criteria to guide CHAP in its decision making and therefore is unconstitutionally vague; and

3. Denial of the demolition permit constitutes an unconstitutional "taking" under the 5th and 14th Amendments.

As have many municipalities, *Penn Central Transportation Company v. City of New York,* 438 U.S. 104, 107-08, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), Baltimore City has enacted legislation intended to prevent the destruction or change in the exterior appearance of buildings and other structures in the city having historical, cultural, educational, architectural, or aesthetic significance.[1] Codified as

---

1. Such legislation involves an exercise of the police power. City of Baltimore v. Mano Swartz, 268 Md. 79, 91, 299 A.2d 828 (1973). Baltimore City derives its zoning power from Art. 66B of the Annotated Code of Maryland. *Id.* at 91. Art. 66B, § 2.12 provides:

"For the purpose of preserving structures and landmarks of historic and architectural value as part of a public purpose in this State, the Mayor and City Council of Baltimore City have the power generally to enact laws for historic and landmark zoning and preservation. This section does not restrict any charter or other power of the city."

Art. 1, § 40 of the Baltimore City Code, the preservation ordinance creates an eleven-member commission for historical and architectural preservation comprised of interested citizens, an architect, a historian, a city council member, and persons nominated by certain specified institutions, such as the Walters Art Gallery and the Maryland Historical Society. This Commission, which has the primary responsibility for administering the preservation ordinance, is empowered to designate "proposed historical and architectural preservation district," § 40 (j); these are defined in § 40 (a) as "area[s] in Baltimore City wherein there are located structures which have historical, cultural, educational and/or architectural value, the preservation of which is deemed to be for the educational, cultural, economic and general welfare of the inhabitants of Baltimore City." In addition, CHAP is empowered to compile a list, known as the "Landmark List," of structures, both public and private, which it deems to be of "special historical or architectural significance, whether or not such structures are within any Historical or Architectural Preservation District." § 40 (k). Both the designation of districts and the inclusion of structures on the landmark list are subject to the City Council approval, which may be given only after notice has been given and a hearing has been held. Once the designation or inclusion has been approved by the City Council, the restrictions of the ordinance take effect; the principal restriction is that a permit must be obtained from the Commissioner of Housing and Community Development (HCD) before any person may alter the exterior appearance of any structure within a historic district or on the landmark list. § 40 (q) (1). Although the required permit is issued or denied by HCD, the actual decision as to whether the permit is to be issued or not is made by CHAP, as HCD is required to forward the permit obligations to CHAP, § 40 (q) (2), and may issue the permit only if CHAP issues either a Certificate of Appropriateness or a Notice to Proceed. § 40 (q) (3). A Certificate of Appropriateness is issued where the proposed alteration is determined to "be appropriate to the preservation of" the district or the structure, § 40 (q) (5) (i); a notice to proceed

is issued, in lieu of a Certificate, where it is determined that the proposed alteration "is inappropriate but is without substantial detriment to the public welfare and without substantial derogation from the intents and purposes of this ordinance, and denial of the application will result in substantial hardship to the applicant." § 40 (q) (5) (ii). Upon receipt of a permit application from HCD, CHAP may issue a Certificate or a Notice "forthwith." If it does not, then the Commission is required to give notice, within ten days, of a public hearing on the application, to hold such a hearing not less than ten and not more than twenty days thereafter, § 40 (q) (4), and to make a determination within fifteen days after conclusion of the hearing. § 40 (q) (5). Upon making its determination, CHAP is to notify HCD, § 40 (q) (7), and HCD is bound by that determination. § 40 (q) (8). If CHAP issues either a Certificate or a Notice, then HCD is to issue the permit, assuming the proposed alteration is otherwise in conformance with the building code. § 40 (q) (8). If CHAP determines that the proposed alteration is inappropriate and declines to issue either a Certificate or a Notice, then it must set forth its reasons and notify HCD that the issuance of the permit is to be postponed. § 40 (q) (9). If so notified, HCD must postpone issuance for a period not to exceed six months, § 40 (q) (9) (i), and CHAP, during the period of postponement, is required to "meet with the applicant for the permit and . . . consult with civic groups, public agencies and interested citizens to ascertain what the City may do to preserve such building." § 40 (q) (9) (ii). The ordinance provides criminal penalties for the carrying out of alterations in violation of its provisions. § 40 (w).

The property involved herein is located in Baltimore City at 104 W. 39th Street and consists of a large, three-story detached house, know as the "Ascot House." Built in the early 1900's, the house was one of the first designed by Laurence Hall Fowler, a distinguished Baltimore architect. This property was purchased by Broadview on June 25, 1976, for $79,500. Broadview, which owns a larger, highrise apartment building in the immediate vicinity, bought two parcels contiguous to the Ascot House at the same time.

Settlement on all three parcels took place on September 28, 1976.

On December 17, 1976, forty-two structures, including the Ascot House, were presented to CHAP and tentatively approved for inclusion on the landmark list. At a meeting on February 4, 1977, CHAP again discussed the structures proposed for inclusion, with several commission members, including the only member who was an architect, expressing doubt as to the architectural significance of the Ascot House.

On February 10, 1977, Broadview, which had purchased the house with the intention of tearing it down and erecting a parking structure to serve its other properties, applied to HCD for a permit to demolish the Ascot House. HCD forwarded the application to CHAP. On February 16, CHAP advised Broadview by letter that its property was to be recommended for designation as a landmark. Two days later, CHAP formally recommended the structure, among others, for inclusion on the landmark list. HCD notified Broadview on April 17, 1977, that the demolition permit would be withheld pending City Council action on the structures proposed for inclusion; on June 10, 1977, the City Council approved inclusion of the structures proposed by CHAP.

Nearly two years after Broadview first applied for a demolition permit, on December 17, 1979, and January 18, 1980, CHAP conducted a hearing on Broadview's application.[2] Broadview presented evidence in support of its claim that the Ascot House had no reasonable economic use. It called Mr. Ralph Davis, the Director of Housing and Rehabilitation for Anne Arundel County and the former rehabilitation services administrator for Baltimore City's Department of Housing and Community Development, and introduced a detailed report prepared by Mr. Davis on November 25,

---

2. Obviously, CHAP did not proceed in accordance with § 40 (q) (4). In a separate action, Broadview sought a writ of mandamus in the Superior Court of Baltimore City, contending that, in view of the delay, HCD was without authority to withhold the requested permit. The Superior Court denied the writ on January 30, 1980, holding that the time limits were not mandatory.

1977, when he was employed by HCD. His testimony and report showed that, at the direction of his supervisor, he had conducted a physical inspection and performed an economic evaluation of the property in November 1977. He had concluded that the property was then in a deteriorated condition and in need of substantial renovation and repair. It was his opinion that the house would require replacement of all wiring and plumbing, extensive masonry repair and carpentry work and painting of both the interior and exterior. It was also his opinion that the roof was in need of replacement, at an approximate cost of $55,000. Minimum total cost, as computed by Mr. Davis, to renovate the house for use as rental property, was $138,000. He projected annual operating expenses of $27,108 for the property. He stated that, even being "generous with the rent structure," assuming the availability of a low interest mortgage and allowing no return on the purchase price, the property would produce annual revenues of $25,668, with an annual net operating loss of $1,440 and thus it was his opinion that the house could not be renovated and operated at a profit. Broadview introduced an estimate prepared in October 1979 by an experienced contractor, Raymond C. Maule & Son, which placed the cost to renovate the Ascot House at $294,375 and which stated that restoration of the house was not economically feasible. The contractor, like Davis, concluded that replacement of the roof was required and estimated cost for that item at $66,300. Broadview also presented a feasibility study and testimony by Mr. O. Ellsworth Stevens, a realtor and property management expert. His study and testimony indicated that the property could be renovated and rented only at a considerable loss. Although Stevens had relied on the Maule estimate in making his calculations, he testified that it was his opinion that operation of the Ascot House would not be economically feasible even if restoration costs were only $100,000. His rent projections were significantly lower than those prepared by Davis. He recommended that the house be razed and the property used either for parking or for the construction of new town houses. Finally, Broadview presented

an appraisal of the property, prepared by the City of Baltimore in 1977, which stated that the best use of the property would involve demolition of the house and devotion of the land to any use consistent with the applicable zoning.

Contradicting Broadview's conclusion that the house had no economic use were a number of letters and written reports which had apparently been solicited by CHAP. All but one of these simply stated, in conclusory fashion and without reference to any supporting data, that restoration of the house was economically feasible; the sole exception was the report prepared by the Ben Morton Company. This report proposed renovation of the house as five luxury apartment units, with projected rehabilitation costs of $102,500, a projected annual rent revenue of $27,360 and annual operating expenses of $8,542, with an annual net income of $18,818. It concluded that renovation and operation of the Ascot House, while "not big money," was feasible. The Morton Company admitted in its report that it had not included any debt service in its calculations; it also failed to provide for any return on the purchase price of the property and proposed only $5,000 in minor roof repairs. In addition, the report appears to have underestimated property taxes by more than one-half.

At the conclusion of the hearing on January 18, 1980, CHAP voted to deny Broadview's application, stating that they were not convinced from the evidence that Broadview was under any economic hardship. Several members of the Commission indicated that they considered Broadview's evidence biased in its favor and that they would not be disposed to find economic hardship except on the basis of information and studies prepared by independent, objective sources; they further indicated that CHAP had no funds available to commission such studies. CHAP's decision was upheld on appeal by the Baltimore City Court on July 15, 1980. Broadview's appeal to this Court followed.

Although every restriction imposed by government upon a landowner's use of his property will not be considered a taking, where the restrictions deprive the landowner of all reasonable, beneficial use of the property, compensation

must be paid. *Penn Central Transportation Co. v. City of New York*, 438 U.S. at 149; *Maryland-National Capital Park and Planning Commission v. Chadwick*, 286 Md. 1, 10, 405 A.2d 241 (1979); *City of Annapolis v. Anne Arundel County*, 271 Md. 265, 294, 316 A.2d 807 (1974). In reviewing the decision of an administrative agency, the scope of review is limited to determining whether there is substantial evidence to support the decision or if it is otherwise arbitrary, i.e., whether a reasoning mind could have reached the factual conclusion reached by the agency. *Cicala v. Disability Review Board*, 288 Md. 254, 260, 418 A.2d 205 (1980).

Broadview presents substantial evidence to support its claim that renovation of the Ascot House was not economically feasible. CHAP discounted this evidence as biased. The City Court, in its memorandum and order affirming CHAP's decision, stated: "It is apparent that the Commission heavily discounted Broadview's evidence and, in reliance on reports submitted by its staff, determined that it was economically feasible to maintain Ascot House as a rental property." In fact, no report or information of any kind was submitted by CHAP's staff, as several commission members complained when announcing their final decision.[3] While CHAP could justifiably discount the Stevens study and the Maule estimate as biased, there is no basis in the record for discounting the Davis report. Davis was a city employee at the time he prepared the report. That his report supported Broadview's claim and was introduced by Broadview did not make it biased. As we indicated above, the sole evidence in the record before CHAP which supported its decision was the study by the Ben Morton Company; that study, in supporting the view that renovation was economically feasible, failed to include any debt service, any recovery of the purchase price, and failed to include the cost of replacing the roof, even though the City itself, in the Davis report, agreed that replacement of the roof was necessary. The Morton report is not substantial

---

**3.** The trial judge was apparently referring to the CHAP solicited letters and reports mentioned above.

evidence. "An expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions." *Worthington Construction Corp. v. Moore,* 266 Md. 19, 29, 291 A.2d 466 (1972). A reasoning mind should not base a decision upon a study which was so woefully incomplete. In reaching this conclusion, we are not weighing the evidence or substituting our judgment for that of CHAP. What we are doing is looking for some evidence, upon which reasonable persons would rely, which supports CHAP's decision. We have found none. In addition, the Commission arbitrarily ignored the only unbiased substantial evidence in the record — the Davis report. We therefore hold that the Baltimore City Court erred in affirming CHAP's denial of the demolition permit.

We do not reach the second and third issues set out at the beginning of this opinion.

*Order reversed.*

*Appellee to pay the costs.*