# MAYOR AND CITY COUNCIL OF BALTIMORE
## ET AL. *v.* MANO SWARTZ, INC. ET AL.

[No. 145, September Term, 1972.]

*Decided February 8, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Joseph S. Matricciani, Assistant City Solicitor,* and *Richard M. Hartman, Special Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellants.

*George A. Nilson,* with whom was *John Martin Jones, Jr.,* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

For the second time we have before us an attack on the validity of Ordinance No. 663 of the Mayor and City Council of Baltimore (the City), approved 1 November 1965, now Baltimore City Code Art. 1, § 39 (1966) (the Ordinance), which was designed to regulate signs in the central business district of Baltimore.

There was testimony that the City had been so successful in limiting the size and design of signs in agreements for the sale of sites in the Charles Center renewal area that a decision was made to endeavor to achieve uniformity in the whole of the downtown district.

In *City of Baltimore v. Charles Center Parking,* 259 Md. 595, 271 A. 2d 144 (1970), we affirmed a decree of the Circuit Court of Baltimore City which had found arbitrary and discriminatory and violative of Article 23 of Maryland's Declaration of Rights and of the Fourteenth Amendment to the Constitution of the United

States § 1 (e) (4) of the Ordinance, which had made unlawful the painting of a sign on an exterior wall of a building. We concluded that this result was mandated by the fact that § 1 (j) of the Ordinance permitted billboards and poster boards, subject to zoning regulations, in the same area where painted signs were prohibited, particularly since the City offered no testimony which would support a rational distinction between painted signs and billboards.

In that case, we addressed ourselves to a narrow issue —the validity of § 1 (e) (4)—and expressed no opinion as regards the validity of the Ordinance as a whole. The assault mounted in this case is of wider scope.

On 30 October 1970, just before the expiration of the five-year moratorium contained in § 1 (g) of the Ordinance, Mano Swartz, Inc., and nine other firms doing business in the central business district (Swartz) filed a bill of complaint in the Circuit Court of Baltimore City against the City and the City's Director of Construction and Building Inspection seeking to enjoin the enforcement of § 1 (e) (1) which proscribes signs projecting more than 12 inches "from the primary surface of the building to which it is attached . . . ." and § 1 (e) (4) which prohibits roof top signs.

Filed with the bill of complaint was the text of the Ordinance:

> "Section 1. *Be it ordained by the Mayor and City Council of Baltimore,* That a new Section 29 [now Section 39] be and it is hereby added to Article 1 of the Baltimore City Code (1950 Edition), title 'Mayor and City Council,' to follow immediately after Section 28 thereof, to be under the new subtitle 'Commission on Signs,' and to read as follows:
>
> 'Commission on Signs
>
> 29.
>
> (a) A Commission on Signs is created. It shall have three members appointed as of Jan-

uary 1, 1966, under the provisions of Article IV, Section 6, of the City Charter. One of the three members shall represent the retail merchants in the area defined in this section. Another member shall represent the sign industry. The third member of the Commission shall be a representative of the public at large. The members of the Commission shall serve without compensation, except they may be reimbursed for actual and reasonable expenses incurred in the discharge of their duties on the Commission. Of the members first appointed, one shall be appointed for a term of two years, one for a term of three years, and one for a term of four years. Thereafter, as memberships expire, they shall be filled for terms of four years each.

(b) The Commission may retain technical advisors, amongst which shall be included an architect, a graphic artist and a sign designer.

(c) The Commission has jurisdiction under this section within the area bounded on the outer limits, respectively, of Center Street on the north, Pratt Street on the south, the Fallsway on the east, Greene Street on the west, and Druid Hill Avenue on the northwest. Jurisdiction shall apply to both sides of the above-mentioned boundary streets.

(d) The Commission, after public notice and hearing, may adopt and promulgate rules and regulations establishing standards and requirements for commercial signs, billboards, and other advertising structures and devices within the area described in this section. Any such rules and regulations shall be designed and intended to provide for beauty, attractiveness, esthetics, and symmetry in the commercial signs, billboards, and other advertising structures and devices, and to relieve conditions of

gaudiness and drabness in certain portions of the defined area.

(e) It shall be unlawful, within the area described, (1) for any commercial sign, billboard, or other advertising structure or device to project outward from the primary surface of the building to which it is attached for a distance of more than 12 inches. The commercial sign, billboard, or other advertising structure or device shall be single-faced and shall not project above the top of the vertical wall of the building to which it is attached; (2) to erect any flashing, animated, or rotating signs; (3) for any commercial sign, billboard, or other advertising sign or device to be permitted or erected on the roof of any building; (4) for any commercial sign, billboard, or other advertising structure or device to be painted on any exterior wall of a building except as a substitute for a sign on the primary facade of said building.

(f) An illuminated or non-illuminated projecting, or free-standing standardized sign, of single or double-face construction, not more than 12 inches in thickness, shall be permitted to designate public parking facilities; such sign to measure not more than four feet in height or width and to project no more than five feet.

(g) Any commercial sign, billboard, or other advertising structure or device which is legally in place on the date any such rules and regulations become effective and which in any respect does not comply with or conform to the rules and regulations affecting it, or which otherwise does not comply with or conform to the provisions of this section, either shall be removed or made to comply with or conform to the rules and regulations within five years from the effective date of this ordinance.

(h) No marquee, canopy or awning, otherwise allowable by law, shall bear any lettering other than the street number; an exception may be made by the Commission for permanent marquees.

Any person who violates any provision of this section, or who, by the end of the said five-year period, does not comply with or conform to the rules or regulations or to the provisions of this section, is guilty of a misdemeanor and upon conviction thereof may be fined not less than twenty-five dollars ($25.00) and not more than one hundred dollars ($100.00) for each violation. Each day upon which a violation continues may be construed as a separate offense.

(i) Nothing in this ordinance shall be construed to apply to any billboard or posterboard with respect to which the Board of Municipal and Zoning Appeals has original jurisdiction under Section 37 of the Baltimore City Zoning Ordinance.

The Board of Municipal and Zoning Appeals shall submit drawings, plans, painted bulletins and specifications and any other data concerning the application for such a billboard or posterboard within the area covered by this ordinance to the Commission on Signs for investigation, recommendation and report.

(j) All ordinances and all rules and regulations of the Mayor and City Council of Baltimore in conflict with the provisions of this section are repealed to the extent of the inconsistency.

"Sec. 2. *And be it further ordained,* That this ordinance shall take effect from the date of its passage.

"Approved November 1, 1965."

It should be noted that the Ordinance purports to regulate not only signs which overhang public ways and

exist only by virtue of minor privilege permits issued by the City's Board of Estimates but also reaches signs maintained wholly within property lines. We do not intend to be understood as expressing any opinion as to whether the City could achieve the result which it desires, at least in part, by declining to renew minor privilege permits as they expire or reissuing them on a conditional basis.

By its decree entered on 13 April 1972, the court found Ordinance 663 invalid and permanently restrained the City and its agencies from requiring the removal of the signs maintained by the complainants. From this decree, the City has appealed.

While Swartz wheeled into place its heaviest artillery and attacked the Ordinance on a broad front, it seems to us that but one issue is dispositive of the case. In its bill of complaint, Swartz alleged:

> "c. That the removal and destruction of the validly established use of the Complainants is beyond the power of the Mayor and City Council.
>
> "d. That the removal and destruction of the validly established use of the Complainants in no way promotes the public health, safety, security, or morals of the community, and the removal and destruction of these vested rights of the Complainants are in no way necessary or proper to the exercise of the police power by the Respondents."

to which the City replied:

> "c. The City is entitled to abolish the existing use by virtue of the police power under Article II, Section 27 of the Baltimore City Charter (1964 Revision), as well as by virtue of Article VIII, Section 2 of the Charter.
>
> "d. The Defendants repeat that the ordinance destroys no vested rights and further allege that

the ordinance is a necessary and proper exercise of the police power."

The chancellor found that the Ordinance was "based upon aesthetic considerations alone" and indeed ample support for this can be found in § 1 (d) :

"Any such rules and regulations [adopted pursuant to the Ordinance for sign control] shall be designed and intended to provide for *beauty, attractiveness, esthetics,* and symmetry in the commercial signs, billboards, and other advertising structures and devices, and to relieve conditions of *gaudiness* and *drabness* in certain portions of the defined area." (Emphasis added)

Van Fossen Schwab, an architect who had been Chairman of the Architectural Advisory Board of the Committee for Downtown and had been directly involved in the drafting of the Ordinance, called as a witness for the City, readily conceded on cross-examination that the sole purpose of the Ordinance was aesthetic.

It is unnecessary to look beyond the wording of the Ordinance, when the wording itself clearly establishes legislative intent, *Atlantic Gulf and Pacific Co. v. State Dept. of Asses. & Tax.,* 252 Md. 173, 183-84, 249 A. 2d 180 (1969) ; *Board of Supervisors of Elections v. Weiss,* 217 Md. 133, 136-37, 141 A. 2d 734 (1958) ; *Smith v. Higinbothom,* 187 Md. 115, 125, 48 A. 2d 754 (1946) ; *Williams v. State,* 144 Md. 18, 21-22, 123 A. 457 (1923).

The Ordinance had as its sole purpose the achievement of an aesthetically pleasing result, and we have held this not to be a permissible use of the police power, *Feldstein v. Kammauf,* 209 Md. 479, 484-89, 121 A. 2d 716 (1956) ; *Goldman v. Crowther,* 147 Md. 282, 302-09, 128 A. 50 (1925) ; *Byrne v. Maryland Realty Co.,* 129 Md. 202, 211, 98 A. 547 (1916) ; *see,* 1 Anderson, *American Law of Zoning* § 7.21 at 520-21 (1968) ; 2 Metzenbaum, *The Law of Zoning* 1577-78 (2d ed. 1955) ; 1 Rathkopf, *The Law of Zoning and Planning* 11-1 (3d ed. 1972) ; 16 Am.Jur.2d *Constitutional Law* § 292 at 569 (1964).

While aesthetic goals may legitimately serve as an additional legislative purpose, if health, morals or safety or other ends generally associated with the concept of public welfare are being served, *County Comm'rs of Queen Anne's County v. Miles,* 246 Md. 355, 368-69, 228 A. 2d 450 (1967) ; *Grant v. Mayor & C.C. of Baltimore,* 212 Md. 301, 316-19, 129 A. 2d 363 (1957) ; *Jack Lewis, Inc. v. Baltimore,* 164 Md. 146, 152-60, 164 A. 220 (1933) ; *Goldman v. Crowther, supra,* 147 Md. at 302-08, *see General Outdoor Advertising Co. v. Department of Public Works,* 289 Mass. 149, 193 N. E. 799, 816 (1935), *appeal dismissed,* 296 U. S. 543, 80 L. Ed. 385, 56 S. Ct. 95, *appeal dismissed,* 297 U. S. 725, 80 L. Ed. 1008, 56 S. Ct. 495; *Dowsey v. Village of Kensington,* 257 N. Y. 221, 177 N. E. 427, 430, 245 N.Y.S. 819, 86 A.L.R. 642 (1931), 1 Anderson, *American Law of Zoning, supra,* § 7.22 at 526; Masotti & Selfon, *Aesthetic Zoning and the Police Power,* 46 J. Urban L. 773, 780-82 (1969), they cannot be the only purpose of regulation, *Byrne v. Maryland Realty Co., supra,* 129 Md. at 211.

The City might well have prevailed had the legislative intent been the elimination of signs or pennants which distracted motorists, *Kenyon Peck, Inc. v. Kennedy,* 210 Va. 60, 168 S.E.2d 117 (1969) or the promotion of highway safety, *Stevens v. City of Salisbury,* 240 Md. 556, 567-68, 214 A. 2d 775 (1965) ; *see E. B. Elliott Adv. Co. v. Metropolitan Dade County,* 425 F. 2d 1141 (5th Cir. 1970), *petition for cert. dismissed,* 400 U. S. 805, 27 L.Ed.2d 35, 91 S. Ct. 12; *Village of Larchmont v. Sutton,* 30 Misc. 2d 245, 217 N.Y.S.2d 929 (1961) ; *approved and followed in, Village of Larchmont v. Levine,* 225 N.Y.S.2d 452 (1961). The fact that another result might have been one which was aesthetically pleasing would not necessarily have imported an element of constitutional infirmity.

The effort to eliminate what was referred to in argument before us as "visual pollution" by controlling signs and billboards through the exercise of the zoning power

has been slowly developing, *General Outdoor Adv. Co. v. Indianapolis,* 202 Ind. 85, 172 N. E. 309, 72 A.L.R. 453 (1930) ; *Opinion of the Justices to the Senate,* 333 Mass. 773, 128 N.E.2d 557, 561 (1955) ; *People v. Sterling,* 128 Misc. 650, 220 N.Y.S. 315 (1927) ; *State ex rel. Saveland Park Holding Corp. v. Wieland,* 269 Wisc. 262, 69 N.W.2d 217, 222 (1955) ; 58 Am. Jur. *Zoning* § 30 at 959 (1948) ; 1 Anderson, *American Law of Zoning, supra,* § 7.21 at 520-23 ; 1 Rathkopf, *Law of Zoning and Planning, supra,* at 11-9, 11-22 ; 1 Yokely, *Zoning Law and Practice* § 2-4 at 28 (3d ed. 1965) ; Dukeminier, *Zoning for Aesthetic Objectives: A Reappraisal,* 20 Law & Contemp. Prob. 218 (1955) ; Masotti & Selfon, *Aesthetic Zoning and the Police Power, supra,* 46 J. Urban L. 773, 779-86 ; Note, 47 Cornell L. Rev. 647, 651-52 (1962) ; Annot., *Aesthetic Objectives or Considerations as Affecting Validity of Zoning Ordinance,* 21 A.L.R.3d 1222, 1225 (1968). The principal difficulty is that other forms of pollution, stench and noise and the like, can be measured by more nearly objective standards. If beauty, however, lies in the eyes of the beholder, so does the tawdry, the gaudy and the vulgar—and courts have traditionally taken a gingerly approach to legislation which circumscribes property rights by applying what amount to subjective standards, which may well be those of an idiosyncratic group. *See discussion in, General Outdoor Advertising Co. v. Department of Public Works, supra,* 193 N. E. 815-16, *Cromwell v. Ferrier,* 19 N.Y.2d 263, 225 N.E.2d 749, 755, 279 N.Y.S.2d 22, 21 A.L.R.3d 1212 (1967) ; Dukeminier, *Zoning for Aesthetic Objectives: A Reappraisal,* 20 Law & Contemp. Prob., *supra,* at 224-29 (1955) ; Michelman, *Toward a Practical Standard for Aesthetic Regulation,* 15 Prac. Law. 36 (1969) ; Norton, *Police Power, Planning and Aesthetics,* 7 Santa Clara Law. 171, 183-85 (1967) ; Note, *Aesthetic Considerations in Land Use Planning,* 35 Albany L. Rev. 126, 131 (1970) ; Note, *Zoning for Aesthetics—A Problem of Definition,* 32 U. Cin. L. Rev. 367, 373 (1963).

We think Justice Cardozo had it about right when, speaking for the New York Court of Appeals in *People v. Rubenfeld*, 254 N. Y. 245, 172 N. E. 485, 486-87 (1930), he observed, by way of dicta:

> "The organs of smell and hearing, assailed by sounds and odors too pungent to be borne, have been ever favored of the law . . . more conspicuously, it seems, than sight, which perhaps is more inured to what is ugly or disfigured . . . . Even so, the test for all the senses, for sight as well as smell and hearing, has been the effect of the offensive practice upon the reasonable man or woman of average sensibilities . . . . One of the unsettled questions of the law is the extent to which the concept of nuisance may be enlarged by legislation so as to give protection to sensibilities that are merely cultural or aesthetic." [citations omitted]

Our predecessors recognized that this problem had long existed when in *Byrne v. Maryland Realty Co., supra,* 129 Md. at 211, they cited with approval the language of the Mississippi court which rejected an attempt through the exercise of the police power to exclude a market from a residential area in *Quintini v. City of Bay St. Louis,* 64 Miss. 483, 1 So. 625, 628 (1887):

> " 'The law can know no distinction between citizens because of the superior cultivation of the one over the other. It is with common humanity that courts and legislatures must deal; and that use of property which in all common sense and reason is not a nuisance to the average man cannot be prohibited because repugnant to some sentiment of a particular class.' " [1]

---

1. Seven years earlier, this Court had commented in a similar vein, in upholding a Mount Vernon Place height regulation on grounds of public safety:
"... it may be that in the development of a higher civilization the culture and refinement of the people has

Until now, only a minority of jurisdictions can be said to have validated regulatory schemes which were primarily [2] or solely [3] concerned with aesthetic considerations, *Stone v. City of Maitland,* 446 F. 2d 83, 89 (5th Cir. 1971) ; *City of St. Paul v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.,* 413 F. 2d 762, 767-68 (8th Cir. 1969) ; *Sunad, Inc. v. Sarasota,* 122 So. 2d 611, 614 (Fla. 1960) ; *State ex rel. Civello v. New Orleans,* 154 La. 271, 97 So. 440, 444-45, 33 A.L.R. 260 (1923) ; *Naegele Outdoor Adv. Co. v. Village of Minnetonka,* 281 Minn. 492, 162 N.W.2d 206, 212 (1968) ; *Cromwell v. Ferrier, supra,* 225 N.E.2d at 753-55; *People v. Stover,* 12 N.Y.2d 462, 191 N.E.2d 272, 274-76, 240 N.Y.S.2d 734 (1963), *appeal dismissed,* 375 U. S. 42, 11 L.Ed.2d 107, 84 S. Ct. 147; *United Advertising Corp. v. Metuchen,* 42 N. J. 1, 198 A. 2d 447, 449 (1964) ; *Oregon City v. Hartke,* 240 Ore. 35, 400 P. 2d 255, 262-63 (1965) ; *State ex rel. Carter v. Harper,* 182 Wisc. 148, 196 N. W. 451, 454-56,

---

reached the point where the educational value of the Fine Arts, as expressed and embodied in architectural symmetry and harmony, is so well recognized as to give sanction, under some circumstances, to the exercise of [the police power] even for such purpose." *Cochran v. Preston,* 108 Md. 220, 229, 70 A. 113 (1908).

2. ". . . the test governing our decision on the constitutional issue presented is whether the village council in exercising its legislative prerogative acted reasonably, with the question of reasonableness to be resolved by deciding whether its determination upon a consideration of the facts was based on reason and logic and not on whim or caprice, and that it promotes a legitimate police-power objective. The mere fact that the adoption of a zoning ordinance reflects a desire to achieve aesthetic ends should not invalidate an otherwise valid ordinance. Thus, if the challenged restriction is reasonably related to promoting the general welfare of the community or any other legitimate police-power objective, the fact that aesthetic considerations are a significant factor in motivating its adoption cannot justify holding it unconstitutional." *Naegele Outdoor Adv. Co. v. Village of Minnetonka,* 281 Minn. 492, 162 N.W.2d 206, 212 (1968).

3. "It is not irrational for those who must live in a community from day to day to plan their physical surroundings in such a way that unsightliness is minimized." *Oregon City v. Hartke,* 240 Ore. 35, 400 P. 2d 255, 263 (1965).

33 A.L.R. 269 (1923); 1 Anderson, *American Law of Zoning, supra,* §§ 7.15, 7.22 at 508, 526 and cases cited therein; Annot., *Aesthetic Objectives or Considerations as Affecting Validity of Zoning Ordinance, supra,* 21 A.L.R.3d, § 4 (a) at 1235 and cases cited therein.

In the instant case, additional infirmity is found in the fact that the Ordinance is in actuality an amendment to the zoning law—a prohibition of signs in parts of Baltimore's first and second commercial use districts—which was enacted without complying with the substantive and procedural requirements of the Zoning Enabling Act, Maryland Code (1957, 1967 Repl. Vol.) Art. 66B, in effect at the time. The Ordinance failed to heed the mandate of § 3 that it be "in accordance with a comprehensive plan" or that of § 2, that it be "uniform for each class or kind of building throughout each district"; nor was § 5, which requires public hearings and at least 15 days' notice, complied with. Baltimore City derives its zoning power from the Act, and not from its charter, *Baylis v. Baltimore,* 219 Md. 164, 167, 148 A. 2d 429 (1959) and must act in the manner prescribed by the Act, *Scrivner v. Baltimore,* 191 Md. 165, 169, 60 A. 2d 190 (1948).

We do not wish to be understood as saying that aesthetic considerations cannot play a proper role in the zoning process, because they do. It has long been recognized that the police power may rightly be exercised to preserve an area which is generally regarded by the public to be pleasing to the eye or historically or architecturally significant. Examples which come to mind may be found in *Grant v. City of Baltimore, supra,* 212 Md. 301, where we upheld an ordinance requiring the removal of billboards from residential areas; in *Ullrich v. State,* 186 Md. 353, 46 A. 2d 637 (1940) and *Jack Lewis, Inc. v. Baltimore, supra,* 164 Md. 149, holding that funeral homes could be banned in residential areas; in the provisions of Code (1957, 1970 Repl. Vol., 1972 Supp.) Art. 66B, §§ 8.01-8.15, permitting the zoning of

historic districts, and in the early cases of *Cochran v. Preston,* 108 Md. 220, 229, 70 A. 113 (1908) and *Garrett v. Janes,* 65 Md. 260, 3 A. 597 (1886) dealing with ordinances intended to preserve the quality of Baltimore's Mount Vernon Place.

In Footnote 88 to his article, *Maryland Zoning—The Court and Its Critics,* 27 Md. L. Rev. 39, 53 (1967), George W. Liebmann concludes, and we think quite rightly, that our case law and statutes have followed the approach urged by Ernst Freund, *Standards of American Legislation* 115-16 (1917):

> "[I]t is undesirable to force by law upon the community standards of taste which a representative legislative body may happen to approve of, and compulsion with that end in view would be justly resented as inconsistent with a traditional spirit of individualism. But it is a different question whether the state may not protect the works of nature or the achievements of art or the associations of history from being wilfully marred. In other words, emphasis should be laid upon the character of the place as having an established claim to consideration and upon the idea of disfigurement as distinguished from the falling short of some standard of beauty."

Because the purpose of the Ordinance was not the preservation or protection of something which was aesthetically pleasing, but rather was intended to achieve by regulation an aesthetically pleasing result, with no thought of enhancing the public welfare, we shall not disturb the result reached below.

*Decree affirmed, costs to be paid by appellants.*