590 A.2d 1080

**COSCAN WASHINGTON, INC.**

v.

**MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION, et al.**

No. 1466, Sept. Term, 1990.

Court of Special Appeals of Maryland.

June 4, 1991.

**604**

Henderson J. Brown (Stephen J. Orens and Frank, Bernstein, Conaway & Goldman, on the brief), Bethesda, for appellant.

Robert C. Sanders, Washington, D.C., for amicus curiae, Prince George's County Historical and Cultural Trust.

Garland H. Stillwell, Associate Gen. Counsel (Ronald D. Schiff, Gen. Counsel, Elizabeth M. Hewlett and Isaac H. Marks, Associate Gen. Counsel, on the brief), Upper Marlboro, for appellee, M–NCPPC.

Robert C. Sanders, on the brief, pro se.

Argued before ROSALYN B. BELL, WENNER and DAVIS, JJ.

ROSALYN B. BELL, Judge.

This case arises from a decision of the Prince George's County Planning Board (Planning Board) of the Maryland–National Capital Park and Planning Commission (Commission or M–NCPPC). The Planning Board approved, with conditions, a Specific Design Plan submitted by Coscan Washington, Inc. (Coscan), appellant, for a residential subdivision called King's Grant. Coscan requested that the Planning Board reconsider a condition that requires a certain percentage of the homes to be constructed of brick, wood, stone, or stucco. The Planning Board denied that request. Coscan appealed to the Circuit Court for Prince George's County under the Maryland Administrative Procedure Act. The circuit court affirmed the decision of the Planning Board and Coscan has appealed. On appeal, Coscan raises the following issues:

—Whether the Planning Board has the authority to specify building materials?

—Whether the Planning Board's conditional approval of the Specific Design Plan was arbitrary and

capricious?[1]

In order to address the issues in a coherent fashion, it is necessary to explain the statutory background and the procedural steps in Comprehensive Design Zoning.

## COMPREHENSIVE DESIGN ZONING

### —Statutory Scheme—

The General Assembly of Maryland authorized the Prince George's County District Council (District Council)[2] to adopt a "General Plan" to regulate development in that portion of the County designated as the Maryland Washington Regional District. Md.Code Ann. Art. 28, § 7–108 (1957, 1990 Repl.Vol.). In March of 1982, the District Council approved a General Plan with the stated goal being to provide guidance for the long-range physical development of the County. The General Plan addresses growth and development in the County, including housing, transportation, agricultural and environmental needs. It also encourages development favorable to the "image of the County as a good place to live and work." Prince George's County General Plan, 26 (1982).

In accordance with Art. 28, § 7–108 and the General Plan, a new zoning approval scheme called the Comprehensive Design Zone (CDZ) process was adopted. *See* Prince George's County Code §§ 27–476 to 27–532.1 (1987 ed.). The CDZ process is an alternative to conventional zoning approval. The CDZ process is more flexible and yet more rigid than conventional zoning. "It is more flexible in the scope of permissible uses, residential densities and building intensities. It is more rigid in that commitments made by

---

1. Coscan also presents a third question: Whether the Planning Board's imposition of a condition mandating the use of specific building materials is sustainable as an effort to assure harmony with an historic site? This question will be adequately addressed in our discussion of the Planning Board's authority to impose the condition.

2. The Prince George's County Council periodically sits as the Prince George's District Council.

the developer in his plan proposals will carry the force and effect of law." Prince George's County Planning Board, A Proposal for Comprehensive Design Regulations, 3 (September 1970).

—Approval Process Under CDZ—

The CDZ process has three stages requiring approval of (1) a Basic Plan, (2) a Comprehensive Design Plan and finally (3) a Specific Design Plan. Prince George's County Code § 27–478. Each stage is more refined than the previous stage. Thus, each stage gives a more detailed and explicit depiction of what the applicant intends to do with the land. Additionally, each stage must conform to the guidelines established in the previous stage. Prince George's County Code §§ 27–518 & 27–528.

The Basic Plan sets out the zoning and general parameters for the development of the subject property. Prince George's County Code § 27–179(c)(1)(D) (1987 ed.). The Basic Plan is approved by the Prince George's County Council, sitting as the District Council. Prince George's County Code § 27–195 (1987 ed.). Approval is based upon referrals and recommendations from the Commission staff and the Planning Board. *See* Prince George's County Code §§ 27–189, 27–191 & 27–192 (1987 ed.).

The Comprehensive Design Plan specifies the design principles of buildings, landscapes and streetscapes. It also specifies the densities and locations of dwelling units and other improvements. Prince George's County Code § 27–518. The Comprehensive Design Plan is approved by the Planning Board. Prince George's County Code § 27–522. An aggrieved party may appeal the Planning Board's decision to the District Council. Prince George's County Code § 27–523.

The final stage in the CDZ process is the Specific Design Plan. At this stage, the plan for development is refined further and must demonstrate that adequate attention has been given to building and landscape design and engineering factors. Prince George's County Code § 27–527. The

Specific Design Plan is approved by the Planning Board. Prince George's County Code § 27-528. Appellant states that an aggrieved party may only appeal to the circuit court under Maryland's Administrative Procedure Act, and appellees do not controvert this statement.[3]

---

**3.** There is some question regarding whether Coscan should have appealed the Planning Board's decision on the approval of the SDP to the District Council before appealing to the circuit court. Maryland Code Ann. Art. 25A, § 5 enumerates the express powers granted to chartered counties. Section 5(U) provides in pertinent part:

> "To enact local laws providing (1) for the establishment of a county board of appeals whose members shall be appointed by the county council; (2) for the number, qualifications, terms, and compensation of the members; (3) for the adoption by the board of rules of practice governing its proceedings; and (4) for the decision by the board on petition by any interested person and after notice and opportunity for hearing and on the basis of the record before the board, of such of the following matters arising (either originally or on review of the action of an administrative officer or agency) under any law, ordinance, or regulation of, or subject to amendment or repeal by, the county council, as shall be specified from time to time by such local laws enacted under this subsection: An application for a zoning variation or exception or amendment of a zoning ordinance map ... Provided, that upon any decision by a county board of appeals it shall file an opinion which shall include a statement of the facts found and the grounds for its decision. Any person aggrieved by the decision of the board and a party to the proceeding before it may appeal to the circuit court for the county which shall have power to affirm the decision of the board, or if such decision is not in accordance with law, to modify or reverse such decision, with or without remanding the case for rehearing as justice may require. Any party to the proceeding in the circuit court aggrieved by the decision of the said court may appeal from such decision to the Court of Special Appeals. *The review proceedings provided by this subsection shall be exclusive.*"

Md.Code Ann. Art. 25A, § 5(U) (1957, 1990 Repl.Vol.) (emphasis added). Chapter 70 of the 1975 Laws of Maryland, however, provides in pertinent part:

> "[I]nsofar as the provisions of this Act [Art. 25A, § 5] may be inconsistent with or contrary to the provisions of the Maryland–Washington Regional District Act, as enacted by Chapter 780 of the Acts of 1959 and any amendments thereto, the provisions of this Act shall have no application so long as such District Act is in force and effect and nothing contained herein shall be deemed or construed to affect the validity, or operative effect, of said Chapter 780 of the Acts of 1959 as amended, which established city and regional planning in Montgomery and Prince George's counties within the

## FACTS

Appellant, Coscan, owns approximately 196 acres of land located just outside the town of Upper Marlboro in Prince George's County. This land is zoned R–S (Residential–Suburban). The R–S classification is one of the Comprehensive Design Zones established by Prince George's County Code § 27–511 (1987 ed.).[4]

An 81.78–acre parcel of Coscan's land is the subject of this litigation and is known as the King's Grant Subdivision (King's Grant). Kings' Grant is located between Brown Station Road and Ritchie–Marlboro Road. It is bordered on the north by Brooke Lane, a two-lane rural road, and on the west by Ritchie–Marlboro Road. (*See* Appendix A.) Six of the King's Grant units will abut an historic property known as Oakland. The Oakland property is improved by a former plantation manor house which was constructed in the 1820s. Oakland, which is an historic resource, is constructed of wood and sits on approximately nine acres of land. It is privately owned.

Coscan proposes to develop the entire 196–acre parcel by constructing 357 attached townhouses on approximately 114 acres fronting Brown Station Road and 119 detached single-family houses on approximately 81.78 acres fronting Ritchie–Marlboro Road. This appeal concerns only the 119 detached single-family houses.

---

limits of the Maryland–Washington Regional District as said district is now or shall hereafter be defined by law."
1975 Md.Laws ch. 70, § 5. The CDZ process was adopted to regulate development in that portion of the Maryland–Washington Regional District located in Prince George's County. Md.Code Ann. Art. 28, § 7–108. The Prince George's County Code is silent on the appeal process from a SDP approval. It does provide for an appeal to the District Council from the CDP approval. What the effect of these various provisions is in this case is not decided as the issue was neither raised nor briefed.

**4.** This classification is a floating zone and entails a mixture of residential types within the suburban density range, *i.e.*, 1.6 to 3.5 dwelling units per gross acre. It generally corresponds to low-density, single-family development and provides for limited convenience-commercial retail and service needs.

In November of 1981, a Basic Plan for the entire 196–acre parcel was approved by the District Council. On December 17, 1987, Coscan filed its Comprehensive Design Plan (CDP) for a 81.78–acre parcel with the Maryland–National Capital Park and Planning Commission (M–NCPPC). Section 27–518(b) of the Prince George's County Code (1987 ed., 1989 supp.), requires a CDP proposal to include a "description of design principles" of the units to be constructed. Thus, Coscan's CDP proposal included a section titled "Architecture" which provided in pertinent part:

"—Material selection will provide for development that is distinctive and reflects high-quality design.

"—Materials which should be encouraged are the following: wood, stone, brick, stucco and other comparable selections."

On September 15, 1988, the Planning Board approved Coscan's CDP. The approval provided that the Design Guidelines be revised to include:

"The choice and mix of materials on the facades of buildings will provide an attractive living environment. Materials which will be encouraged include wood, stone, brick, and stucco. Aluminum and vinyl siding will be discouraged."

On September 13, 1989, Coscan submitted its Specific Design Plan (SDP) for the 81.78–acre parcel of land. Section 27–527(b) of the Prince George's County Code (1987 ed., 1989 supp.), requires that SDP proposals include, among other things, "preliminary architectural plans, including floor plans and exterior elevations." Coscan's SDP proposal offered vinyl siding as the standard exterior finish on all sides of the units.

On December 14, 1989, the Urban Design Section of the M–NCPPC issued a memorandum, stating that Coscan's SDP proposal did not conform to the CDP provision that aluminum and vinyl siding would be discouraged. On December 21, 1989, a hearing on Coscan's SDP proposal was held before the Planning Board. A member of the Urban

Design Section suggested during testimony that approval of the SDP be conditioned upon 60 percent of the units being constructed of brick, wood, stone, or stucco. The Planning Board unanimously approved the inclusion of this condition and instructed the Urban Design Section to draft a resolution for signature.

On January 8, 1990, the Planning Board issued Resolution No. 89–660 which approved Coscan's SDP proposal with certain conditions. Coscan has challenged Condition 2, which provides:

"Sixty percent of the total number of units shall consist of a single facade material including brick, stone, wood or stucco as an exterior finish material. A minimum of 20 percent of units of the 60 percent stated above, shall be all brick. None of the units with an exterior finish material of aluminum or horizontal siding shall be located directly adjacent to the Historic Oaklands [sic] property. The various styles and materials used in the construction of units shall be distributed throughout the development to provide visual variety and interest. Units directly adjacent to the historic resource shall be [of] a variety of materials and a style of architecture compatible with the historic resource."

Coscan requested that the Planning Board reconsider Condition 2. The Planning Board denied that request, but ordered the issuance of a corrected resolution to resolve certain ambiguities in Condition 2. The revised Condition 2 provides:

"Sixty percent (60%) of the total number of units shall have exterior elevations of one hundred percent (100%) (except foundations or chimneys) of either brick, stone, wood or stucco. Of this sixty percent (60%), at least one-third shall have exterior elevations of one hundred percent (100%) brick. Units directly adjacent to the historic site shall be all brick. The various styles and materials used in the construction of units shall be distributed throughout the development to provide visual variety and interest."

Coscan appealed to the Circuit Court for Prince George's County. The circuit court affirmed the decision of the Planning Board and Coscan has appealed. The appellees in this case are the Commission and Robert Clagett Sanders.[5] Additionally, the Prince George's County Historical and Cultural Trust filed a brief as an amicus curiae. The position of the Trust is essentially the same as appellee Sanders. We shall affirm the judgment of the circuit court. We explain.

## AUTHORITY TO PRESCRIBE BUILDING MATERIALS

Appellant argues that the Planning Board does not have the authority to prescribe the type of building materials to be used in the construction of homes. Appellant attacks the Planning Board's authority to impose Condition 2 on three grounds. First, appellant argues that there is no authority under the Prince George's County Code to impose Condition 2. Second, appellant argues that there is no authority under the General Plan to impose Condition 2. Third, appellant contends that the imposition of Condition 2 is an impermissible exercise of the police power under Maryland case law. We disagree.

### —The County Code—

Section 27–527 of the Prince George's County Code dictates the factors the Planning Board shall consider in reviewing an application for a Specific Design Plan. That Section provides:

"(a) The applicant shall demonstrate to the Planning Board that, in the preparation of the Specific Design Plan, he has devoted adequate attention to building and landscape design, and engineering factors. The signatures of a qualified design team (including an architect, a landscape architect, and a professional engineer) on the

---

**5.** Mr. Sanders's family had owned the historic property known as Oakland which abuts the King's Grant development. Mr. Sanders stated that the property has "family significance"; as such, he was given "interested party status" in the case.

Specific Design Plan shall be prima facie evidence that the respective factors within the scope of the signer's profession have been considered.

"(b) The Specific Design Plan shall include (at least) the following:

"(1) A reproducible site plan showing buildings, functional use areas, circulation, and relationships between them;

"(2) Reproducible preliminary architectural plans, including floor plans and exterior elevations; and

"(3) A reproducible landscape plan prepared in accordance with the provisions of the Landscape Manual."

The architectural community has recognized that building design "includes the element of physical imagery, which entails form, space, light, color, texture, and pattern." F. Ching, *Building Construction Illustrated*, 2.5 (1975). As stated previously, the Planning Board is authorized to review building design before approving a SDP. The term "building design" is broad enough to include the type of building materials because these materials affect the form, texture and pattern of the building.

■ Moreover, § 27–528 of the Prince George's County Code provides that the SDP must conform to the CDP. The CDP in the instant case provided that wood, stone, brick and stucco would be encouraged and that vinyl and aluminum siding would be discouraged. In direct contravention to this design guideline, appellant proposed in its application for a SDP that the standard exterior finish for all sides of the buildings would be aluminum siding. The Planning Board's imposition of Condition 2 was a reasonable step to insure that the SDP conforms to the guidelines set forth in the CDP.

—The General Plan—

Appellant also argues that the Planning Board did not have the authority to impose Condition 2 under the General Plan. As previously noted, the General Assembly has au-

thorized the District Council to adopt a General Plan for development in the County. Md.Code Ann. Art. 28, § 7–108 (1957, 1990 Repl.Vol.). In formulating the General Plan, the District Council has been directed to consider many factors. Art. 28, § 7–108(a)(3). Among other things, the District Council may consider:

"Existing and forecasted needs and demand for housing, and the amount, *type, quality,* and general location of housing;

\*   \*   \*   \*   \*   \*

Sites, structures, areas, or settings of archeological, *historical,* architectural, cultural, *or scenic value* or *significance....*"

Art. 28, § 7–108(a)(3)(vi) and (ix) (emphasis added).

Pursuant to this legislative authority, the District Council adopted a General Plan. The stated objectives of the General Plan include:

"4   To improve the quality of development and the image of the County as a good place to live and work ...

(a) by ensuring high standards of construction in all forms of housing, as well as high quality environments for all residential areas;

\*   \*   \*   \*   \*   \*

"5   To play a role in regional development which is increasingly advantageous to Prince George's County ...

\*   \*   \*   \*   \*   \*

(i) by continually improving the quality of neighborhoods and housing so as to make the County a more attractive place for quality economic development projects;

\*   \*   \*   \*   \*   \* .

"8   To assure sound economic development and the expansion of the tax base ...

\*   \*   \*   \*   \*   \*

(f) by encouraging the development of upper-income housing;

\* \* \* \* \* \*

"12 To provide decent, safe, and sanitary housing for all County residents ...

\* \* \* \* \* \*

(d) by making attractive provision within the County for upward mobility in housing choices as an alternative to out-migration...."

Prince George's County General Plan, 26, 28, 31 (March 1982). The quoted portions of both Art. 28, § 7–108 and the General Plan would be meaningless if the Planning Board had no authority to regulate the architecture, quality, style and materials of new housing beyond the minimum building code requirements.

■ Appellant argues, however, that neither the language nor the purpose of the General Plan supports the conclusion that the Planning Board is authorized to prescribe the type of building materials to be used in the construction of homes. It contends that because the General Plan is a guide and not a mandate it cannot be used to support the Planning Board's actions in this case. We disagree.

The introductory language of the General Plan provides: "1 The General Plan is a guide—not a mandate. It neither encourages nor discourages growth, but says what should happen if and when development occurs. "2 The General Plan is a policies plan. It deals with countywide issues and their interrelationships. The Plan defines basic policy areas. It does not prescribe specific land uses or zoning recommendations for individual parcels of land."

Prince George's County General Plan, 13 (March 1982). We agree that provisions of the General Plan are not a specific mandate. That does not mean, however, that the guidelines and policies described within it cannot support the Planning Board's actions here. Many laws authorize a course of

conduct without mandating that conduct. Moreover, a statement by the District Council of guidelines and policies is superfluous if that statement does not authorize the Planning Board to implement those guidelines and policies.

—The Case Law—

Appellant also argues that the Planning Board is prohibited from prescribing the type of materials to be used in the construction of homes by Maryland case law. It contends that Condition 2 was imposed solely for aesthetic reasons. Therefore, appellant concludes, the imposition of Condition 2 was an inappropriate exercise of governmental authority. Appellant cites the case of *City of Baltimore v. Mano Swartz*, 268 Md. 79, 299 A.2d 828 (1973), to support its arguments.

In *Mano Swartz*, the City of Baltimore sought to prohibit certain commercial signs within the City's downtown area. *Mano Swartz*, 268 Md. at 81–84, 299 A.2d 828. The Court noted that the language of the ordinance made it clear that its sole purpose was aesthetic. The Court invalidated the ordinance:

"The Ordinance had as its sole purpose the achievement of an aesthetically pleasing result, and we have held this not to be a permissible use of the police power.

"While aesthetic goals may legitimately serve as an additional legislative purpose, if health, morals or safety or other ends generally associated with the concept of public welfare are being served, they cannot be the only purpose of regulation."

*Mano Swartz*, 268 Md. at 86–87, 299 A.2d 828 (citations omitted).

Appellant argues that "[i]f the distinction between primary and secondary objective is to bear any weight at all, one can not assume that because the government acts generally to protect the health, safety and welfare that *any* regulation which has aesthetic result *must* be presumed to be valid." (Emphasis in original.) Appellant contends that in the instant case there is no evidence that any benefit

accrues to the public's general welfare by insisting on all brick construction. Thus, because the general welfare is not served by Condition 2, appellant concludes it should not be required to expend additional funds to achieve an aesthetic result.[6]

■ The Commission argues that the Planning Board has the authority to regulate for the purpose of aesthetics because it has the express authority to regulate development to protect and promote the general welfare. Md.Code Ann. Art. 28, § 7–110 (1957, 1990 Repl.Vol.). Essentially, the Commission argues that aesthetic considerations are always a matter of protecting and promoting the general welfare. We reject such an argument. To accept this argument would, in effect, validate all governmental attempts to regulate aesthetics as legitimate regulations for the general welfare. This would overrule *Mano Swartz, supra,* and a long line of cases.

The Commission also attempts to distinguish the instant case from *Mano Swartz* on several grounds. The first three grounds are based on the fact that the Planning Board's action in the instant case is authorized by State and County legislation. The next ground is that the Planning Board did not completely prohibit aluminum or vinyl siding while the City of Baltimore attempted to prohibit all signs. Finally, the Commission argues that this case is distinguishable because the Comprehensive Design Zoning process is not mandatory, but a development alternative. The Commission, however, seems to have missed the point.

■ Whether regulations for the sole purpose of aesthetics are a valid exercise of the police power is, at heart, a matter of constitutional law. If the act of a governmental

---

6. We find that this statement is unsupported. It implies that appellant will lose money if it builds better quality, aesthetically pleasing homes. Generally, if a home costs more to build because it is made of higher quality materials, the home will command a higher price. Appellant produced no evidence that its profit margins will decrease markedly.

body is an improper use of the police power, no legislative enactment from any source will validate that act. Thus, the fact that the State Legislature and the Prince George's County Council have authorized the Planning Board to consider aesthetics does not empower the Planning Board to make decisions solely on the basis of aesthetic reasons.

■ Additionally, simply because the Planning Board did not completely prohibit vinyl and aluminum siding would not validate a decision if it was based solely on aesthetic reasons. A decision based solely on aesthetic reasons is invalid whether it completely prohibits or only partially prohibits certain acts. Moreover, simply because the zoning process used in this case is an alternative rather than a mandatory process cannot validate an otherwise invalid act. The freedom of an applicant to choose between alternative processes does not give the government the power to do that which the government cannot otherwise do.

Whether the Planning Board may regulate the type of material used in constructing homes depends on whether there were legitimate reasons for regulating building materials other than aesthetics. Clearly, aesthetics were a consideration in this case. Even so, the Planning Board's decision will stand if aesthetics were not the sole consideration. The Court of Appeals stated in *Mano Swartz*, 268 Md. at 91, 299 A.2d 828:

"We do not wish to be understood as saying that aesthetic considerations cannot play a proper role in the zoning process, because they do. It has long been recognized that the police power may rightly be exercised to preserve an area which is generally regarded by the public to be pleasing to the eye or historically or architecturally significant."

Appellees advance a number of legitimate reasons for the imposition of Condition 2. Those reasons are: (1) conformance to the CDP; (2) improving the quality of housing in Prince George's County; (3) protecting a scenic area; and

(4) preserving an historic site. We shall address each of these reasons separately.

Appellant chose to pursue the CDZ approval process instead of conventional zoning. As noted previously, the CDZ process involves certain trade-offs. The applicant receives more liberal zoning classifications in exchange for the applicant's agreement to certain conditions. One such condition is that the SDP will conform to the CDP. Prince George's County Code § 27–528(a). Appellant, at the CDP stage, agreed that brick, stone, wood and stucco should be encouraged.[7] While aesthetics may have been a partial basis for this guideline, appellant agreed to it. As we stated earlier, Condition 2 was a reasonable method of ensuring that the SDP conformed to the CDP. Moreover, when the motion to impose Condition 2 was introduced, a commissioner prefaced the motion as follows: "In order that this site plan conforms to the Comprehensive Design Plan, I make the following motion for approval." The record clearly indicates that this was an important consideration in the instant case.

Appellees also argue that a legitimate consideration in imposing Condition 2 was the improvement in the quality of the housing in the subdivision. We agree.

The General Assembly has authorized the District Council to consider the type and quality of housing to be constructed in the County when adopting the General Plan. Md.Code Ann. Art. 28, § 7–108(a)(3)(vi). Pursuant to this authority, the General Plan has the stated objectives of (1) improving "the quality of development and the image of the County as a good place to live and work," (2) "improving the quality of neighborhoods and housing," (3) assuring "sound economic development and the expansion of the tax base ... by encouraging the development of upper-income housing," and (4) "making attractive provision within the County for upward mobility in housing choices as an alternative to

---

**7.** In fact, appellant suggested this condition in its CDP proposal.

out-migration." Prince George's County General Plan, 26, 28, 31 (1982).

At the public hearing, the Planning Board heard testimony from a number of citizens. Appellee Sanders testified:

"If you put in quality housing in the County, that encourages more people to want to come and upscale the area, and on the other hand if we don't do that it re-enforces what I think is something of an inferiority complex.... [D]evelopers tell us that we really can't build the upscale Potomac or McClean [sic] type houses down here, because if we do that we really can't sell them. So they put in houses of a lesser quality and then that reinforces the sense that the area will not support the better housing."

Sanders went on to testify:

"[I]t takes the initiative of someone to break that chain of saying we can't do it, therefore we build less attractive housing which re-enforces the sense that we can't do it. But I think it's a crucial time right now. I think [in] the next 5 or 10 years, if the County can upgrade its standard and appearance of housing, it could attract a very, very strong tax base and a really good professional type of residents."

Similarly, Mrs. Dorothy Troutman of the Rural Preservation Alliance testified:

"[W]e're concerned about this development because it sets a pattern for what follows.... We would like to see the same materials used that you have that condition of the CDP."

Thus, there was testimony before the Planning Board that improving the quality of housing would provide benefits, other than aesthetic value, to the community. The Planning Board could properly regulate the type of building materials to be used in order to improve the quality of housing.

Appellees also argue that the Planning Board properly imposed Condition 2 to protect a scenic area. The Prince George's County General Plan provides that one of the

goals of that Plan is "[t]o preserve and protect environmental quality ... by preserving natural and scenic assets as an integral part of the development process...." Prince George's County General Plan, 29 (1982).

Sanders expressed the hope that "the rural character of the area around the Oakland Historical Site can be maintained...." He explained:

"[T]hat particular area, Brooke Lane, it's a little narrow one-lane country road with tall oak trees on each side. It is right now exactly the way it looked several hundred years ago. It is rolling farm land and with a bunch of very beautiful old houses in that area. It seems to me that if there is any location in the County where we should be particularly sensitive to the quality of the structures and the plantings, I can't imagine an area in which the concerns are more important."

Mrs. Troutman voiced the same concerns for scenic protection:

"[Ritchie–Marlboro Road] is a scenic, rural, historic road, and our group, the Rural Preservation Alliance, is attempting to preserve our countryside.

\* \* \* \* \* \*

Now we're especially concerned, not just about Oakland[s], but about Ritchie–Marlboro Road, because that's zoned for two-acres, most of it is, and one acre right across from this development on Brooke Lane the land is one acre zoning. So we're concerned about this development because it sets a pattern for what follows."

Additionally, Commissioner Yewell commented that Condition 2 "doesn't all have to do with the historic structure; it has to do with the whole area." Finally, as Chairman Rhoads explained:

"[W]hat we are looking at is this valley between an historic property on one side and [the Chesapeake Bay

Foundation property] [8] on the other side, and we have this beautiful piece of property in the center."

The Planning Board's decision was clearly based, in part, on an intent to preserve a scenic area, a purpose well within its authority.

Appellees argue that Condition 2 was also imposed in part to protect the approach to and vistas from the Oakland historic site. Appellant argues, however, that the Planning Board has no authority to regulate land adjacent to an historic site for the purpose of preserving the historic site. We disagree and explain.

Maryland Code Ann. Art. 28, § 8-101 (1957, 1990 Repl. Vol.), provides in pertinent part:

"(c) **Power to regulate for the protection of historical, archeological, etc., sites, structures or districts.**—In order to protect the historical, archeological, architectural or cultural heritage of areas in Montgomery and Prince George's Counties comprising the regional district and to preserve and enhance the quality of life in the community, in addition to any power or authority of the district councils to regulate by ordinance, planning, zoning or subdivision, each district council may provide by ordinance regulations for the protection, preservation and enhancement of sites, structures with their appurtenances and environmental settings, or districts of historical, archeological, architectural or cultural value designated on the adopted and approved general plan. The enactment and application of these regulations shall be reasonable and appropriate to the purpose of this section and are limited to the protection, preservation and enhancement of the exterior of the sites, structures or districts,

---

**8.** This land was originally owned by Thomas Clagett VI. The land was divided into several plantations for his sons and grandsons. Those plantations were known as Weston, The Cottage, Strawberry Hill, Oakland, Keokuk, Ingleside, and Navajo. According to a report of the Historic Preservation Commission, the area is still essentially rural in character and is of unique historical importance. Part of this land is now held in trust by the Chesapeake Bay Foundation.

and, if such action constitutes a taking of private property, provision shall be made for just compensation."

Appellant argues that the District Council has exercised its power to protect historic sites by enacting Subtitle 29 of the Prince George's County Code which created the Historic Preservation Commission (HPC). Under Subtitle 29, the HPC

"shall adopt architectural and design guidelines which shall specify such characteristics as materials, colors, signage, landscaping, and other design-related considerations that will be permitted, encouraged, limited, or excluded from Historic Sites or Historic Districts. Such guidelines shall be subject to review and approval by the District Council prior to their becoming effective."

Prince George's County Code § 29–105(k) (1987 ed.).

■ Appellant argues that, because the District Council did not delegate specific authority to the Planning Board to regulate architecture in areas adjacent to historic sites, the Planning Board has no such authority. Essentially, appellant argues that, when the General Assembly authorized the District Council to enact ordinances for the protection of historic areas, the General Assembly intended to restrict the District Council's authority to regulate historic areas to this method. We find this interpretation of Art. 28, § 8–101(c) overly narrow. Moreover, the language of the statute itself belies such an interpretation. The statute provides that the power to regulate historic areas under Art. 28, § 8–101(c) is "in addition to any power or authority of the district councils to regulate by ordinance, planning, zoning or subdivision...."

As noted previously, both the Prince George's County Code and the General Plan provide that the District Council consider building design in approving a SDP. It defies common sense to require the Planning Board to consider building design in a vacuum. Building design can only be evaluated effectively in the context of the environment in which the buildings will ultimately exist. An important

consideration in this evaluation is the historical importance of not only the land on which the structures will be built, but the adjacent land as well.

Moreover, the Prince George's County General Plan specifically provides that the historic value of a particular area is an important consideration in planning development. Goal three of the General Plan is to "achieve an improved quality of life through the development of human resources ... by protecting and preserving the County's cultural and historical heritage." Prince George's County General Plan, 25 (1982). Thus, the Planning Board could properly consider the historical significance of the adjacent land and surrounding area in evaluating appellant's SDP.

As appellant admits in its brief, architectural compatibility with the historic Oakland property was fundamental to the Planning Board's decision to specify building materials. The historical importance of an area is a legitimate consideration in the zoning process. *Mano Swartz,* 268 Md. at 91, 299 A.2d 828.

In sum, the Planning Board's decision to impose Condition 2 and mandate that a minimum percentage of houses be wood, brick, stone or stucco was not based solely on aesthetics. That decision was also based on ensuring that the SDP conformed to the CDP, improving the quality of housing in Prince George's County, protecting a scenic area and preserving an historic area. We hold that the Planning Board had the authority to specify building materials in the instant case.

## ARBITRARY AND CAPRICIOUS

Appellant also argues that the Planning Board's decision to impose Condition 2 was arbitrary and capricious for three reasons. First, appellant argues that in imposing Condition 2 the Planning Board used an incorrect definition of the term "facade." Second, appellant argues that Condition 2 renders one or more of the guidelines in the CDP superfluous. Third, appellant argues that the imposition of Condi-

tion 2 was arbitrary because the Planning Board did not impose the same condition when approving the Fox Chase subdivision, a nearby development. We disagree with all three conditions. We explain.

—Standard of Review—

■ An agency's decision must be reviewed in the light most favorable to the agency. *Courtney v. Board of Trustees,* 285 Md. 356, 362, 402 A.2d 885 (1979). A decision of an agency is prima facie correct and carries with it the presumption of validity. *Courtney,* 285 Md. at 362, 402 A.2d 885. A court will not reject a conclusion of an agency if "a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978), quoting *Dickinson–Tidewater v. Supervisor,* 273 Md. 245, 256, 329 A.2d 18 (1974). Furthermore, it is the province of the agency to resolve conflicting evidence and where inconsistent inferences may be drawn from the same evidence, it is for the agency to draw the inferences. *Bulluck,* 283 Md. at 513, 390 A.2d 1119.

—CDP Guidelines—

Appellant argues that the imposition of Condition 2 is arbitrary and capricious because it is based on an arbitrary and capricious reading of the CDP building guidelines. Specifically, appellant argues that the Planning Board's interpretation of one of the CDP guidelines is arbitrary because: (1) it renders another guideline superfluous and (2) it is based on an incorrect definition of the term "facade."

■ In imposing Condition 2, one of the Planning Board's purposes was to ensure that the SDP conformed to two of the CDP guidelines. Those guidelines provide:
"The choice and mix of materials on the facades of buildings will provide an attractive living environment. Materials which will be encouraged include wood, stone,

brick and stucco. Aluminum and vinyl siding will be discouraged.

"If a side or rear elevation faces a street or common space, it shall be designed with the same attention to detail and in the same material as the front."

Appellant contends that Condition 2, which was imposed to ensure that the SDP conformed with the first of these guidelines, renders the second guideline superfluous. We disagree. Condition 2 is not inconsistent with the second guideline. The second guideline applies only to those units whose sides or rear face a street or common area. Under the second guideline, the sides or rear of these units must be made of the same material as the front. Many of the 60 percent of the units which under Condition 2 are required to be all brick, stone, wood or stucco could be units whose sides or rear face a street or common area. Condition 2 implements the requirements of the second guideline as well as the first. Condition 2 does not offend the second guideline or make it superfluous.

■ Appellant also argues that the Planning Board incorrectly interpreted the term "facade," as used in the first guideline. As noted previously, that guideline provides:

"The choice and mix of materials on the facades of buildings will provide an attractive living environment. Materials which will be encouraged include wood, stone, brick, and stucco. Aluminum and vinyl siding will be discouraged."

The Planning Board interpreted the term "facade" to mean all four exterior elevations of a building.

Appellant argues that in both common and technical usage the term "facade" refers only to the front exterior elevation. We disagree. At the hearing on appellant's Request for Reconsideration, the following definition was placed in the record:

"FACADE: *The entire exterior side of a building,* especially the front; the face of a structure; the front elevation or exterior face of a building."

*Architectural And Building Trades Dictionary* 125 (1950 Illustrated Ed.). Thus, the term "facade" may mean all exterior sides of a building or the front of a building only. The fact that the Planning Board chose the more inclusive definition does not render its decision arbitrary or unreasonable. The Planning Board relied on an accepted trade definition. Moreover, the use of the plural form of the word "facade" in the guideline indicates that the Planning Board was referring to more than one side of a building. Thus, a reasoning mind reasonably could have come to the conclusion that "facade" refers to all exterior sides of a building.

Appellant also argues, however, that the Planning Board's interpretation of the term "facade" is unreasonable because members of the Planning Board occasionally used the term to mean only the front of a building during hearings. During the same hearings, counsel for appellant occasionally used the term "facade" to mean all sides of a building. As noted previously, the fact that the Planning Board ultimately chose one definition over the other does not render that choice arbitrary.

Finally, appellant argues that the Planning Board's decision to impose Condition 2 was arbitrary and capricious because a similar condition was not imposed in a nearby development called Fox Chase. Appellant's argument, however, ignores one important distinction between the Fox Chase development and the King's Grant development. The Fox Chase subdivision was approved under the conventional zoning process. Conventional zoning is regulated under a separate statutory scheme. The requirements for zoning approval and the amount of control the Planning Board may exercise under conventional zoning differ substantially from the requirements and authority of the Planning Board under the Comprehensive Design Zone process. The fact that a condition similar to Condition 2 was not imposed on Fox Chase does not render the decision to impose that condition in the instant case arbitrary and capricious.

Appellant also argues that the Planning Board did not impose a condition similar to Condition 2 when, almost a year before the decision in this case, it considered another of appellant's projects called Arbor Park. The CDP for Arbor Park also provided:

"The choice and mix of materials on the facades of buildings will provide an attractive living environment. Materials which will be encouraged include wood, stone, brick, and stucco. Aluminum and vinyl siding will be discouraged."

When the Planning Board approved the SDP for Arbor Park, however, it did not specify the type of building materials to be used. Although the exact location of the Arbor Park subdivision is not clear, the record makes clear that Arbor Park is not adjacent to, or even in close proximity to, an historic site. Moreover, according to the Commission, the uses surrounding Arbor Park are more commercial and intensive. The Arbor Park development differs significantly in its environmental setting from the King's Grant development. As noted previously, the Planning Board may regulate the type of building materials to be used in development projects to protect an historic site. The factual differences between King's Grant and Arbor Park certainly support the regulation of building materials in the former but not the latter.

## CONCLUSION

We hold that the Planning Board has the authority to regulate the type of building materials to be used in a development when proceeding under the Comprehensive Design Zone process. We also hold that the Planning Board's decision to impose Condition 2, namely, the type of building materials to be used, was not arbitrary and capricious.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.